# EWING *v.* CALIFORNIA

No. 01–6978.   Argued November 5, 2002—Decided March 5, 2003

12

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined. SCALIA, J., *post*, p. 31, and THOMAS, J., *post*, p. 32, filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 32. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 35.

*Quin Denvir,* by appointment of the Court, 535 U. S. 1076, argued the cause for petitioner. With him on the briefs were *David M. Porter, Karyn H. Bucur,* and *Mark E. Haddad.*

*Donald E. De Nicola,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *Bill Lockyer,* Attorney General, *Manuel M. Medeiros,* State Solicitor General, *Robert R. Anderson,* Chief Assistant Attorney General, *Pamela C. Hamanaka,* Senior Assistant Attorney General, and *Jaime L. Fuster, Kristofer S. Jorstad,* and *David C. Cook,* Deputy Attorneys General.

*Assistant Attorney General Chertoff* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Deputy Solicitor General Dreeben, John P. Elwood,* and *Joel M. Gershowitz.\**

---

*\*Donald M. Falk, Andrew H. Schapiro,* and *Mary Price* filed a brief for Families Against Mandatory Minimums as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *William H. Pryor, Jr.,* Attorney General of Alabama, *Nathan A. Forrester,* Solicitor General, and *Michael B. Billingsley,* Deputy Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Carter* of Indiana, *Don Stenberg* of Nebraska,

14

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE KENNEDY join.

In this case, we decide whether the Eighth Amendment prohibits the State of California from sentencing a repeat felon to a prison term of 25 years to life under the State's "Three Strikes and You're Out" law.

## I

## A

California's three strikes law reflects a shift in the State's sentencing policies toward incapacitating and deterring repeat offenders who threaten the public safety. The law was designed "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses." Cal. Penal Code Ann. § 667(b) (West 1999). On March 3, 1993, California Assemblymen Bill Jones and Jim Costa introduced Assembly Bill 971, the legislative version of what would later become the three strikes law. The Assembly Committee on Public Safety defeated the bill only weeks later. Public outrage over the defeat sparked a voter initiative to add Proposition 184, based loosely on the bill, to the ballot in the November 1994 general election.

On October 1, 1993, while Proposition 184 was circulating, 12-year-old Polly Klaas was kidnaped from her home in Petaluma, California. Her admitted killer, Richard Allen Davis, had a long criminal history that included two prior kidnaping convictions. Davis had served only half of his

W. A. Drew Edmondson of Oklahoma, Hardy Myers of Oregon, John Cornyn of Texas, Mark L. Shurtleff of Utah, Christine O. Gregoire of Washington, and Hoke MacMillan of Wyoming; and for the Criminal Justice Legal Foundation et al. by Kent S. Scheidegger and Charles L. Hobson.

Dennis L. Stout and Grover D. Merritt filed a brief for the California District Attorneys Association as amicus curiae.

most recent sentence (16 years for kidnaping, assault, and burglary). Had Davis served his entire sentence, he would still have been in prison on the day that Polly Klaas was kidnaped.

Polly Klaas' murder galvanized support for the three strikes initiative. Within days, Proposition 184 was on its way to becoming the fastest qualifying initiative in California history. On January 3, 1994, the sponsors of Assembly Bill 971 resubmitted an amended version of the bill that conformed to Proposition 184. On January 31, 1994, Assembly Bill 971 passed the Assembly by a 63 to 9 margin. The Senate passed it by a 29 to 7 margin on March 3, 1994. Governor Pete Wilson signed the bill into law on March 7, 1994. California voters approved Proposition 184 by a margin of 72 to 28 percent on November 8, 1994.

California thus became the second State to enact a three strikes law. In November 1993, the voters of Washington State approved their own three strikes law, Initiative 593, by a margin of 3 to 1. U. S. Dept. of Justice, National Institute of Justice, J. Clark, J. Austin, & D. Henry, "Three Strikes and You're Out": A Review of State Legislation 1 (Sept. 1997) (hereinafter Review of State Legislation). Between 1993 and 1995, 24 States and the Federal Government enacted three strikes laws. *Ibid.* Though the three strikes laws vary from State to State, they share a common goal of protecting the public safety by providing lengthy prison terms for habitual felons.

## B

California's current three strikes law consists of two virtually identical statutory schemes "designed to increase the prison terms of repeat felons." *People* v. *Superior Court of San Diego Cty. ex rel. Romero,* 13 Cal. 4th 497, 504, 917 P. 2d 628, 630 (1996) *(Romero).* When a defendant is convicted of a felony, and he has previously been convicted of one or more prior felonies defined as "serious" or "violent" in Cal. Penal Code Ann. §§ 667.5 and 1192.7 (West Supp. 2002), sentencing

is conducted pursuant to the three strikes law. Prior convictions must be alleged in the charging document, and the defendant has a right to a jury determination that the prosecution has proved the prior convictions beyond a reasonable doubt. § 1025; § 1158 (West 1985).

If the defendant has one prior "serious" or "violent" felony conviction, he must be sentenced to "twice the term otherwise provided as punishment for the current felony conviction." § 667(e)(1) (West 1999); § 1170.12(c)(1) (West Supp. 2002). If the defendant has two or more prior "serious" or "violent" felony convictions, he must receive "an indeterminate term of life imprisonment." § 667(e)(2)(A) (West 1999); § 1170.12(c)(2)(A) (West Supp. 2002). Defendants sentenced to life under the three strikes law become eligible for parole on a date calculated by reference to a "minimum term," which is the greater of (a) three times the term otherwise provided for the current conviction, (b) 25 years, or (c) the term determined by the court pursuant to § 1170 for the underlying conviction, including any enhancements. §§ 667(e)(2)(A)(i)–(iii) (West 1999); §§ 1170.12(c)(2)(A)(i)–(iii) (West Supp. 2002).

Under California law, certain offenses may be classified as either felonies or misdemeanors. These crimes are known as "wobblers." Some crimes that would otherwise be misdemeanors become "wobblers" because of the defendant's prior record. For example, petty theft, a misdemeanor, becomes a "wobbler" when the defendant has previously served a prison term for committing specified theft-related crimes. § 490 (West 1999); § 666 (West Supp. 2002). Other crimes, such as grand theft, are "wobblers" regardless of the defendant's prior record. See § 489(b) (West 1999). Both types of "wobblers" are triggering offenses under the three strikes law only when they are treated as felonies. Under California law, a "wobbler" is presumptively a felony and "remains a felony except when the discretion is actually exercised" to make the crime a misdemeanor. *People* v. *Wil-*

*liams,* 27 Cal. 2d 220, 229, 163 P. 2d 692, 696 (1945) (emphasis deleted and internal quotation marks omitted).

In California, prosecutors may exercise their discretion to charge a "wobbler" as either a felony or a misdemeanor. Likewise, California trial courts have discretion to reduce a "wobbler" charged as a felony to a misdemeanor either before preliminary examination or at sentencing to avoid imposing a three strikes sentence. Cal. Penal Code Ann. §§ 17(b)(5), 17(b)(1) (West 1999); *People* v. *Superior Court of Los Angeles Cty. ex rel. Alvarez,* 14 Cal. 4th 968, 978, 928 P. 2d 1171, 1177–1178 (1997). In exercising this discretion, the court may consider "those factors that direct similar sentencing decisions," such as "the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, . . . [and] the general objectives of sentencing." *Ibid.* (internal quotation marks and citations omitted).

California trial courts can also vacate allegations of prior "serious" or "violent" felony convictions, either on motion by the prosecution or *sua sponte.* *Romero, supra,* at 529–530, 917 P. 2d, at 647–648. In ruling whether to vacate allegations of prior felony convictions, courts consider whether, "in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [three strikes'] scheme's spirit, in whole or in part." *People* v. *Williams,* 17 Cal. 4th 148, 161, 948 P. 2d 429, 437 (1998). Thus, trial courts may avoid imposing a three strikes sentence in two ways: first, by reducing "wobblers" to misdemeanors (which do not qualify as triggering offenses), and second, by vacating allegations of prior "serious" or "violent" felony convictions.

## C

On parole from a 9-year prison term, petitioner Gary Ewing walked into the pro shop of the El Segundo Golf

18

Course in Los Angeles County on March 12, 2000. He walked out with three golf clubs, priced at $399 apiece, concealed in his pants leg. A shop employee, whose suspicions were aroused when he observed Ewing limp out of the pro shop, telephoned the police. The police apprehended Ewing in the parking lot.

Ewing is no stranger to the criminal justice system. In 1984, at the age of 22, he pleaded guilty to theft. The court sentenced him to six months in jail (suspended), three years' probation, and a $300 fine. In 1988, he was convicted of felony grand theft auto and sentenced to one year in jail and three years' probation. After Ewing completed probation, however, the sentencing court reduced the crime to a misdemeanor, permitted Ewing to withdraw his guilty plea, and dismissed the case. In 1990, he was convicted of petty theft with a prior and sentenced to 60 days in the county jail and three years' probation. In 1992, Ewing was convicted of battery and sentenced to 30 days in the county jail and two years' summary probation. One month later, he was convicted of theft and sentenced to 10 days in the county jail and 12 months' probation. In January 1993, Ewing was convicted of burglary and sentenced to 60 days in the county jail and one year's summary probation. In February 1993, he was convicted of possessing drug paraphernalia and sentenced to six months in the county jail and three years' probation. In July 1993, he was convicted of appropriating lost property and sentenced to 10 days in the county jail and two years' summary probation. In September 1993, he was convicted of unlawfully possessing a firearm and trespassing and sentenced to 30 days in the county jail and one year's probation.

In October and November 1993, Ewing committed three burglaries and one robbery at a Long Beach, California, apartment complex over a 5-week period. He awakened one of his victims, asleep on her living room sofa, as he tried to disconnect her video cassette recorder from the television in

that room. When she screamed, Ewing ran out the front door. On another occasion, Ewing accosted a victim in the mailroom of the apartment complex. Ewing claimed to have a gun and ordered the victim to hand over his wallet. When the victim resisted, Ewing produced a knife and forced the victim back to the apartment itself. While Ewing rifled through the bedroom, the victim fled the apartment screaming for help. Ewing absconded with the victim's money and credit cards.

On December 9, 1993, Ewing was arrested on the premises of the apartment complex for trespassing and lying to a police officer. The knife used in the robbery and a glass cocaine pipe were later found in the back seat of the patrol car used to transport Ewing to the police station. A jury convicted Ewing of first-degree robbery and three counts of residential burglary. Sentenced to nine years and eight months in prison, Ewing was paroled in 1999.

Only 10 months later, Ewing stole the golf clubs at issue in this case. He was charged with, and ultimately convicted of, one count of felony grand theft of personal property in excess of $400. See Cal. Penal Code Ann. § 484 (West Supp. 2002); § 489 (West 1999). As required by the three strikes law, the prosecutor formally alleged, and the trial court later found, that Ewing had been convicted previously of four serious or violent felonies for the three burglaries and the robbery in the Long Beach apartment complex. See § 667(g) (West 1999); § 1170.12(e) (West Supp. 2002).

At the sentencing hearing, Ewing asked the court to reduce the conviction for grand theft, a "wobbler" under California law, to a misdemeanor so as to avoid a three strikes sentence. See §§ 17(b), 667(d)(1) (West 1999); § 1170.12(b)(1) (West Supp. 2002). Ewing also asked the trial court to exercise its discretion to dismiss the allegations of some or all of his prior serious or violent felony convictions, again for purposes of avoiding a three strikes sentence. See *Romero*, 13 Cal. 4th, at 529–531, 917 P. 2d, at 647–648. Before sen-

tencing Ewing, the trial court took note of his entire criminal history, including the fact that he was on parole when he committed his latest offense. The court also heard arguments from defense counsel and a plea from Ewing himself.

In the end, the trial judge determined that the grand theft should remain a felony. The court also ruled that the four prior strikes for the three burglaries and the robbery in Long Beach should stand. As a newly convicted felon with two or more "serious" or "violent" felony convictions in his past, Ewing was sentenced under the three strikes law to 25 years to life.

The California Court of Appeal affirmed in an unpublished opinion. No. B143745 (Apr. 25, 2001). Relying on our decision in *Rummel* v. *Estelle,* 445 U. S. 263 (1980), the court rejected Ewing's claim that his sentence was grossly disproportionate under the Eighth Amendment. Enhanced sentences under recidivist statutes like the three strikes law, the court reasoned, serve the "legitimate goal" of deterring and incapacitating repeat offenders. The Supreme Court of California denied Ewing's petition for review, and we granted certiorari, 535 U. S. 969 (2002). We now affirm.

## II

### A

The Eighth Amendment, which forbids cruel and unusual punishments, contains a "narrow proportionality principle" that "applies to noncapital sentences." *Harmelin* v. *Michigan,* 501 U. S. 957, 996–997 (1991) (KENNEDY, J., concurring in part and concurring in judgment); cf. *Weems* v. *United States,* 217 U. S. 349, 371 (1910); *Robinson* v. *California,* 370 U. S. 660, 667 (1962) (applying the Eighth Amendment to the States via the Fourteenth Amendment). We have most recently addressed the proportionality principle as applied to terms of years in a series of cases beginning with *Rummel* v. *Estelle, supra.*

In *Rummel*, we held that it did not violate the Eighth Amendment for a State to sentence a three-time offender to life in prison with the possibility of parole. *Id.*, at 284–285. Like Ewing, Rummel was sentenced to a lengthy prison term under a recidivism statute. Rummel's two prior offenses were a 1964 felony for "fraudulent use of a credit card to obtain $80 worth of goods or services," and a 1969 felony conviction for "passing a forged check in the amount of $28.36." *Id.*, at 265. His triggering offense was a conviction for felony theft—"obtaining $120.75 by false pretenses." *Id.*, at 266.

This Court ruled that "[h]aving twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State." *Id.*, at 284. The recidivism statute "is nothing more than a societal decision that when such a person commits yet another felony, he should be subjected to the admittedly serious penalty of incarceration for life, subject only to the State's judgment as to whether to grant him parole." *Id.*, at 278. We noted that this Court "has on occasion stated that the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." *Id.*, at 271. But "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Id.*, at 272. Although we stated that the proportionality principle "would . . . come into play in the extreme example . . . if a legislature made overtime parking a felony punishable by life imprisonment," *id.*, at 274, n. 11, we held that "the mandatory life sentence imposed upon this petitioner does not constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments," *id.*, at 285.

In *Hutto* v. *Davis*, 454 U. S. 370 (1982) *(per curiam)*, the defendant was sentenced to two consecutive terms of 20 years in prison for possession with intent to distribute nine

ounces of marijuana and distribution of marijuana. We held that such a sentence was constitutional: "In short, *Rummel* stands for the proposition that federal courts should be reluctant to review legislatively mandated terms of imprisonment, and that successful challenges to the proportionality of particular sentences should be exceedingly rare." *Id.*, at 374 (citations and internal quotation marks omitted).

Three years after *Rummel*, in *Solem* v. *Helm*, 463 U. S. 277, 279 (1983), we held that the Eighth Amendment prohibited "a life sentence without possibility of parole for a seventh nonviolent felony." The triggering offense in *Solem* was "uttering a 'no account' check for $100." *Id.*, at 281. We specifically stated that the Eighth Amendment's ban on cruel and unusual punishments "prohibits . . . sentences that are disproportionate to the crime committed," and that the "constitutional principle of proportionality has been recognized explicitly in this Court for almost a century." *Id.*, at 284, 286. The *Solem* Court then explained that three factors may be relevant to a determination of whether a sentence is so disproportionate that it violates the Eighth Amendment: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id.*, at 292.

Applying these factors in *Solem*, we struck down the defendant's sentence of life without parole. We specifically noted the contrast between that sentence and the sentence in *Rummel*, pursuant to which the defendant was eligible for parole. 463 U. S., at 297; see also *id.*, at 300 ("[T]he South Dakota commutation system is fundamentally different from the parole system that was before us in *Rummel*"). Indeed, we explicitly declined to overrule *Rummel:* "[O]ur conclusion today is not inconsistent with *Rummel* v. *Estelle*." 463 U. S., at 303, n. 32; see also *id.*, at 288, n. 13 ("[O]ur decision

is entirely consistent with this Court's prior cases—including *Rummel* v. *Estelle*").

Eight years after *Solem,* we grappled with the proportionality issue again in *Harmelin.* *Harmelin* was not a recidivism case, but rather involved a first-time offender convicted of possessing 672 grams of cocaine. He was sentenced to life in prison without possibility of parole. A majority of the Court rejected Harmelin's claim that his sentence was so grossly disproportionate that it violated the Eighth Amendment. The Court, however, could not agree on why his proportionality argument failed. JUSTICE SCALIA, joined by THE CHIEF JUSTICE, wrote that the proportionality principle was "an aspect of our death penalty jurisprudence, rather than a generalizable aspect of Eighth Amendment law." 501 U. S. at 994. He would thus have declined to apply gross disproportionality principles except in reviewing capital sentences. *Ibid.*

JUSTICE KENNEDY, joined by two other Members of the Court, concurred in part and concurred in the judgment. JUSTICE KENNEDY specifically recognized that "[t]he Eighth Amendment proportionality principle also applies to noncapital sentences." *Id.,* at 997. He then identified four principles of proportionality review—"the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors"—that "inform the final one: The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.,* at 1001 (citing *Solem, supra,* at 288). JUSTICE KENNEDY's concurrence also stated that *Solem* "did not mandate" comparative analysis "within and between jurisdictions." 501 U. S., at 1004–1005.

The proportionality principles in our cases distilled in JUSTICE KENNEDY's concurrence guide our application of the

Eighth Amendment in the new context that we are called upon to consider.

## B

For many years, most States have had laws providing for enhanced sentencing of repeat offenders. See, e. g., U. S. Dept. of Justice, Bureau of Justice Assistance, National Assessment of Structured Sentencing (1996). Yet between 1993 and 1995, three strikes laws effected a sea change in criminal sentencing throughout the Nation.[1] These laws responded to widespread public concerns about crime by targeting the class of offenders who pose the greatest threat to public safety: career criminals. As one of the chief architects of California's three strikes law has explained: "Three Strikes was intended to go beyond simply making sentences tougher. It was intended to be a focused effort to create a sentencing policy that would use the judicial system to reduce serious and violent crime." Ardaiz, California's Three Strikes Law: History, Expectations, Consequences, 32 McGeorge L. Rev. 1, 12 (2000) (hereinafter Ardaiz).

Throughout the States, legislatures enacting three strikes laws made a deliberate policy choice that individuals who have repeatedly engaged in serious or violent criminal behavior, and whose conduct has not been deterred by more conventional approaches to punishment, must be isolated from society in order to protect the public safety. Though three strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important policy decisions is longstanding. *Weems,* 217 U. S., at 379; *Gore* v. *United States,* 357 U. S. 386, 393

---

[1] It is hardly surprising that the statistics relied upon by JUSTICE BREYER show that prior to the enactment of the three strikes law, "*no* one like Ewing could have served more than *10* years in prison." *Post,* at 43 (dissenting opinion) (emphasis added). Profound disappointment with the perceived lenity of criminal sentencing (especially for repeat felons) led to passage of three strikes laws in the first place. See, e. g., Review of State Legislation 1.

(1958); *Payne* v. *Tennessee,* 501 U. S. 808, 824 (1991); *Rummel,* 445 U. S., at 274; *Solem,* 463 U. S., at 290; *Harmelin,* 501 U. S., at 998 (KENNEDY, J., concurring in part and concurring in judgment).

Our traditional deference to legislative policy choices finds a corollary in the principle that the Constitution "does not mandate adoption of any one penological theory." *Id.,* at 999 (KENNEDY, J., concurring in part and concurring in judgment). A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation. See 1 W. LaFave & A. Scott, Substantive Criminal Law § 1.5, pp. 30–36 (1986) (explaining theories of punishment). Some or all of these justifications may play a role in a State's sentencing scheme. Selecting the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts.

When the California Legislature enacted the three strikes law, it made a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime. Nothing in the Eighth Amendment prohibits California from making that choice. To the contrary, our cases establish that "States have a valid interest in deterring and segregating habitual criminals." *Parke* v. *Raley,* 506 U. S. 20, 27 (1992); *Oyler* v. *Boles,* 368 U. S. 448, 451 (1962) ("[T]he constitutionality of the practice of inflicting severer criminal penalties upon habitual offenders is no longer open to serious challenge"). Recidivism has long been recognized as a legitimate basis for increased punishment. See *Almendarez-Torres* v. *United States,* 523 U. S. 224, 230 (1998) (recidivism "is as typical a sentencing factor as one might imagine"); *Witte* v. *United States,* 515 U. S. 389, 400 (1995) ("In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense . . . [is] 'a stiffened penalty for the latest crime, which is considered to be an aggravated

offense because a repetitive one'" (quoting *Gryger* v. *Burke*, 334 U. S. 728, 732 (1948))).

California's justification is no pretext. Recidivism is a serious public safety concern in California and throughout the Nation. According to a recent report, approximately 67 percent of former inmates released from state prisons were charged with at least one "serious" new crime within three years of their release. See U. S. Dept. of Justice, Bureau of Justice Statistics, P. Langan & D. Levin, Special Report: Recidivism of Prisoners Released in 1994, p. 1 (June 2002). In particular, released property offenders like Ewing had higher recidivism rates than those released after committing violent, drug, or public-order offenses. *Id.*, at 8. Approximately 73 percent of the property offenders released in 1994 were arrested again within three years, compared to approximately 61 percent of the violent offenders, 62 percent of the public-order offenders, and 66 percent of the drug offenders. *Ibid.*

In 1996, when the Sacramento Bee studied 233 three strikes offenders in California, it found that they had an aggregate of 1,165 prior felony convictions, an average of 5 apiece. See Furillo, Three Strikes—The Verdict: Most Offenders Have Long Criminal Histories, Sacramento Bee, Mar. 31, 1996, p. A1. The prior convictions included 322 robberies and 262 burglaries. *Ibid.* About 84 percent of the 233 three strikes offenders had been convicted of at least one violent crime. *Ibid.* In all, they were responsible for 17 homicides, 7 attempted slayings, and 91 sexual assaults and child molestations. *Ibid.* The Sacramento Bee concluded, based on its investigation, that "[i]n the vast majority of the cases, regardless of the third strike, the [three strikes] law is snaring [the] long-term habitual offenders with multiple felony convictions . . . ." *Ibid.*

The State's interest in deterring crime also lends some support to the three strikes law. We have long viewed both incapacitation and deterrence as rationales for recidivism

statutes: "[A] recidivist statute['s] . . . primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time." *Rummel, supra,* at 284. Four years after the passage of California's three strikes law, the recidivism rate of parolees returned to prison for the commission of a new crime dropped by nearly 25 percent. California Dept. of Justice, Office of the Attorney General, "Three Strikes and You're Out"—Its Impact on the California Criminal Justice System After Four Years, p. 10 (1998). Even more dramatically:

> "An unintended but positive consequence of 'Three Strikes' has been the impact on parolees leaving the state. More California parolees are now leaving the state than parolees from other jurisdictions entering California. This striking turnaround started in 1994. It was the first time more parolees left the state than entered since 1976. This trend has continued and in 1997 more than 1,000 net parolees left California." *Ibid.*

See also Janiskee & Erler, Crime, Punishment, and Romero: An Analysis of the Case Against California's Three Strikes Law, 39 Duquesne L. Rev. 43, 45–46 (2000) ("Prosecutors in Los Angeles routinely report that 'felons tell them they are moving out of the state because they fear getting a second or third strike for a nonviolent offense'" (quoting Sanchez, A Movement Builds Against "Three Strikes" Law, Washington Post, Feb. 18, 2000, p. A3)).

To be sure, California's three strikes law has sparked controversy. Critics have doubted the law's wisdom, cost-efficiency, and effectiveness in reaching its goals. See, *e. g.,* Zimring, Hawkins, & Kamin, Punishment and Democracy: Three Strikes and You're Out in California (2001); Vitiello, Three Strikes: Can We Return to Rationality? 87 J. Crim.

L. & C. 395, 423 (1997). This criticism is appropriately directed at the legislature, which has primary responsibility for making the difficult policy choices that underlie any criminal sentencing scheme. We do not sit as a "superlegislature" to second-guess these policy choices. It is enough that the State of California has a reasonable basis for believing that dramatically enhanced sentences for habitual felons "advance[s] the goals of [its] criminal justice system in any substantial way." See *Solem*, 463 U. S., at 297, n. 22.

## III

Against this backdrop, we consider Ewing's claim that his three strikes sentence of 25 years to life is unconstitutionally disproportionate to his offense of "shoplifting three golf clubs." Brief for Petitioner 6. We first address the gravity of the offense compared to the harshness of the penalty. At the threshold, we note that Ewing incorrectly frames the issue. The gravity of his offense was not merely "shoplifting three golf clubs." Rather, Ewing was convicted of felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of at least two "violent" or "serious" felonies. Even standing alone, Ewing's theft should not be taken lightly. His crime was certainly not "one of the most passive felonies a person could commit." *Solem, supra,* at 296 (internal quotation marks omitted). To the contrary, the Supreme Court of California has noted the "seriousness" of grand theft in the context of proportionality review. See *In re Lynch,* 8 Cal. 3d 410, 432, n. 20, 503 P. 2d 921, 936, n. 20 (1972). Theft of $1,200 in property is a felony under federal law, 18 U. S. C. §641, and in the vast majority of States. See App. B to Brief for Petitioner 21a.

That grand theft is a "wobbler" under California law is of no moment. Though California courts have discretion to reduce a felony grand theft charge to a misdemeanor, it remains a felony for all purposes "unless and until the trial

court imposes a misdemeanor sentence." *In re Anderson*, 69 Cal. 2d 613, 626, 447 P. 2d 117, 126 (1968) (Tobriner, J., concurring); see generally 1 B. Witkin & N. Epstein, California Criminal Law §73 (3d ed. 2000). "The purpose of the trial judge's sentencing discretion" to downgrade certain felonies is to "impose a misdemeanor sentence in those cases in which the rehabilitation of the convicted defendant either does not require, or would be adversely affected by, incarceration in a state prison as a felon." *Anderson, supra*, at 664–665, 447 P. 2d, at 152 (Tobriner, J., concurring). Under California law, the reduction is not based on the notion that a "wobbler" is "conceptually a misdemeanor." *Necochea* v. *Superior Court*, 23 Cal. App. 3d 1012, 1016, 100 Cal. Rptr. 693, 695 (1972). Rather, it is "intended to extend misdemeanant treatment to a potential felon." *Ibid.* In Ewing's case, however, the trial judge justifiably exercised her discretion not to extend such lenient treatment given Ewing's long criminal history.

In weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. In imposing a three strikes sentence, the State's interest is not merely punishing the offense of conviction, or the "triggering" offense: "[I]t is in addition the interest . . . in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law." *Rummel*, 445 U. S., at 276; *Solem, supra*, at 296. To give full effect to the State's choice of this legitimate penological goal, our proportionality review of Ewing's sentence must take that goal into account.

Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and

amply supported by his own long, serious criminal record.[2] Ewing has been convicted of numerous misdemeanor and felony offenses, served nine separate terms of incarceration, and committed most of his crimes while on probation or parole. His prior "strikes" were serious felonies including robbery and three residential burglaries. To be sure, Ewing's sentence is a long one. But it reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated. The State of California "was entitled to place upon [Ewing] the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State." *Rummel, supra,* at 284. Ewing's is not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Harmelin,* 501 U. S., at 1005 (KENNEDY, J., concurring in part and concurring in judgment).

We hold that Ewing's sentence of 25 years to life in prison, imposed for the offense of felony grand theft under the three strikes law, is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on

---

[2] JUSTICE BREYER argues that including Ewing's grand theft as a triggering offense cannot be justified on *"property-crime-related incapacitation grounds"* because such crimes do not count as prior strikes. *Post,* at 51. But the State's interest in dealing with repeat felons like Ewing is not so limited. As we have explained, the overarching objective of the three strikes law is to prevent serious or violent offenders like Ewing from repeating their criminal behavior. See Cal. Penal Code Ann. § 667(b) (West 1999) ("It is the intent of the Legislature . . . to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses"). The California Legislature therefore made a "deliberate policy decision . . . that the gravity of the new felony should not be a determinative factor in 'triggering' the application of the Three Strikes Law." Ardaiz 9. Neither the Eighth Amendment nor this Court's precedent forecloses that legislative choice.

cruel and unusual punishments. The judgment of the California Court of Appeal is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

In my opinion in *Harmelin* v. *Michigan*, 501 U. S. 957, 985 (1991), I concluded that the Eighth Amendment's prohibition of "cruel and unusual punishments" was aimed at excluding only certain *modes* of punishment, and was not a "guarantee against disproportionate sentences." Out of respect for the principle of *stare decisis*, I might nonetheless accept the contrary holding of *Solem* v. *Helm*, 463 U. S. 277 (1983)—that the Eighth Amendment contains a narrow proportionality principle—if I felt I could intelligently apply it. This case demonstrates why I cannot.

Proportionality—the notion that the punishment should fit the crime—is inherently a concept tied to the penological goal of retribution. "[I]t becomes difficult even to speak intelligently of 'proportionality,' once deterrence and rehabilitation are given significant weight," *Harmelin, supra*, at 989—not to mention giving weight to the purpose of California's three strikes law: incapacitation. In the present case, the game is up once the plurality has acknowledged that "the Constitution does not mandate adoption of any one penological theory," and that a "sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation." *Ante*, at 25 (internal quotation marks omitted). That acknowledgment having been made, it no longer suffices merely to assess "the gravity of the offense compared to the harshness of the penalty," *ante*, at 28; that classic description of the proportionality principle (alone and in itself quite resistant to policy-free, legal analysis) now becomes merely the "first" step of the inquiry, *ibid.* Having completed that step (by a discussion which, in all fairness, does not convincingly establish that 25-years-to-life is a "proportionate" punishment for stealing three golf clubs), the

plurality must then *add* an analysis to show that "Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons." *Ante*, at 29.

Which indeed it is—though why that has anything to do with the principle of proportionality is a mystery. Perhaps the plurality should revise its terminology, so that what it reads into the Eighth Amendment is not the unstated proposition that all punishment should be reasonably proportionate to the gravity of the offense, but rather the unstated proposition that all punishment should reasonably pursue the multiple purposes of the criminal law. That formulation would make it clearer than ever, of course, that the plurality is not applying law but evaluating policy.

Because I agree that petitioner's sentence does not violate the Eighth Amendment's prohibition against cruel and unusual punishments, I concur in the judgment.

JUSTICE THOMAS, concurring in the judgment.

I agree with JUSTICE SCALIA's view that the proportionality test announced in *Solem* v. *Helm*, 463 U. S. 277 (1983), is incapable of judicial application. Even were *Solem's* test perfectly clear, however, I would not feel compelled by *stare decisis* to apply it. In my view, the Cruel and Unusual Punishments Clause of the Eighth Amendment contains no proportionality principle. See *Harmelin* v. *Michigan*, 501 U. S. 957, 966–985 (1991) (opinion of SCALIA, J.).

Because the plurality concludes that petitioner's sentence does not violate the Eighth Amendment's prohibition on cruel and unusual punishments, I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

JUSTICE BREYER has cogently explained why the sentence imposed in this case is both cruel and unusual.[1] The concur-

---

[1] For "present purposes," *post*, at 36, 53 (dissenting opinion), JUSTICE BREYER applies the framework established by *Harmelin* v. *Michigan*, 501 U. S. 957, 1004–1005 (1991), in analyzing Ewing's Eighth Amendment

rences prompt this separate writing to emphasize that proportionality review is not only capable of judicial application but also required by the Eighth Amendment.

"The Eighth Amendment succinctly prohibits 'excessive' sanctions." *Atkins* v. *Virginia,* 536 U. S. 304, 311 (2002); see also U. S. Const., Amdt. 8 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). Faithful to the Amendment's text, this Court has held that the Constitution directs judges to apply their best judgment in determining the proportionality of fines, see, *e. g., United States* v. *Bajakajian,* 524 U. S. 321, 334–336 (1998), bail, see, *e. g., Stack* v. *Boyle,* 342 U. S. 1, 5 (1951), and other forms of punishment, including the imposition of a death sentence, see, *e. g., Coker* v. *Georgia,* 433 U. S. 584, 592 (1977). It "would be anomalous indeed" to suggest that the Eighth Amendment makes proportionality review applicable in the context of bail and fines but not in the context of other forms of punishment, such as imprisonment. *Solem* v. *Helm,* 463 U. S. 277, 289 (1983). Rather, by broadly prohibiting excessive sanctions, the Eighth Amendment directs judges to exercise their wise judgment in assessing the proportionality of all forms of punishment.

The absence of a black-letter rule does not disable judges from exercising their discretion in construing the outer limits on sentencing authority that the Eighth Amendment imposes. After all, judges are "constantly called upon to draw . . . lines in a variety of contexts," *id.,* at 294, and to exercise their judgment to give meaning to the Constitution's broadly phrased protections. For example, the Due Process Clause directs judges to employ proportionality re-

claim. I agree with JUSTICE BREYER that Ewing's sentence is grossly disproportionate even under *Harmelin*'s narrow proportionality framework. However, it is not clear that this case is controlled by *Harmelin,* which considered the proportionality of a life sentence imposed on a drug offender who had *no* prior felony convictions. Rather, the three-factor analysis established in *Solem* v. *Helm,* 463 U. S. 277, 290–291 (1983), which specifically addressed recidivist sentencing, seems more directly on point.

view in assessing the constitutionality of punitive damages awards on a case-by-case basis. See, *e. g.*, *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 562 (1996). Also, although the Sixth Amendment guarantees criminal defendants the right to a speedy trial, the courts often are asked to determine on a case-by-case basis whether a particular delay is constitutionally permissible or not. See, *e. g.*, *Doggett* v. *United States*, 505 U. S. 647 (1992).[2]

Throughout most of the Nation's history—before guideline sentencing became so prevalent—federal and state trial judges imposed specific sentences pursuant to grants of authority that gave them uncabined discretion within broad ranges. See K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) (hereinafter Stith & Cabranes) ("From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion"); see also *Mistretta* v. *United States*, 488 U. S. 361, 364 (1989). It was not unheard of for a statute to authorize a sentence ranging from one year to life, for example. See, *e. g.*, *State* v. *Perley*, 86 Me. 427, 30 A. 74, 75 (1894) (citing Maine statute that made robbery punishable by imprisonment for life or any term of years); *In re Southard*, 298 Mich. 75, 77, 298 N. W. 457 (1941) ("The offense of 'robbery armed' is punishable by imprisonment for life or any term

---

[2] Numerous other examples could be given of situations in which courts—faced with imprecise commands—must make difficult decisions. See, *e. g.*, *Kyles* v. *Whitley*, 514 U. S. 419 (1995) (reviewing whether undisclosed evidence was material); *Arizona* v. *Fulminante*, 499 U. S. 279 (1991) (considering whether confession was coerced and, if so, whether admission of the coerced confession was harmless error); *Strickland* v. *Washington*, 466 U. S. 668 (1984) (addressing whether defense counsel's performance was deficient and whether any deficiency was prejudicial); *Darden* v. *Wainwright*, 477 U. S. 168 (1986) (assessing whether prosecutorial misconduct deprived defendant of a fair trial); *Christensen* v. *Harris County*, 529 U. S. 576, 589 (2000) (SCALIA, J., concurring in part and concurring in judgment) (addressing whether an agency's construction of a statute was "'reasonable'").

of years"). In exercising their discretion, sentencing judges wisely employed a proportionality principle that took into account all of the justifications for punishment—namely, deterrence, incapacitation, retribution, and rehabilitation. See Stith & Cabranes 14. Likewise, I think it clear that the Eighth Amendment's prohibition of "cruel and unusual punishments" expresses a broad and basic proportionality principle that takes into account all of the justifications for penal sanctions. It is this broad proportionality principle that would preclude reliance on any of the justifications for punishment to support, for example, a life sentence for over-time parking. See *Rummel* v. *Estelle*, 445 U. S. 263, 274, n. 11 (1980).

Accordingly, I respectfully dissent.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The constitutional question is whether the "three strikes" sentence imposed by California upon repeat-offender Gary Ewing is "grossly disproportionate" to his crime. *Ante,* at 14, 30–31 (plurality opinion). The sentence amounts to a real prison term of at least 25 years. The sentence-triggering criminal conduct consists of the theft of three golf clubs priced at a total of $1,197. See *ante,* at 18. The offender has a criminal history that includes four felony convictions arising out of three separate burglaries (one armed). *Ante,* at 18–19. In *Solem* v. *Helm,* 463 U. S. 277 (1983), the Court found grossly disproportionate a somewhat longer sentence imposed on a recidivist offender for triggering criminal conduct that was somewhat less severe. In my view, the differences are not determinative, and the Court should reach the same ultimate conclusion here.

I

This Court's precedent sets forth a framework for analyzing Ewing's Eighth Amendment claim. The Eighth Amendment forbids, as "cruel and unusual punishments," prison

terms (including terms of years) that are "grossly dispropor-
tionate." *Solem, supra,* at 303; see *Lockyer* v. *Andrade,
post,* at 71. In applying the "gross disproportionality" prin-
ciple, courts must keep in mind that "legislative policy" will
primarily determine the appropriateness of a punishment's
"severity," and hence defer to such legislative policy judg-
ments. *Gore* v. *United States,* 357 U. S. 386, 393 (1958); see
*Harmelin* v. *Michigan,* 501 U. S. 957, 998 (1991) (KENNEDY,
J., concurring in part and concurring in judgment); *Solem,
supra,* at 289–290; *Rummel* v. *Estelle,* 445 U. S. 263, 274–276
(1980); *Weems* v. *United States,* 217 U. S. 349, 373 (1910). If
courts properly respect those judgments, they will find that
the sentence fails the test only in *rare* instances. *Solem,
supra,* at 290, n. 16; *Harmelin, supra,* at 1004 (KENNEDY, J.,
concurring in part and concurring in judgment); *Rummel,
supra,* at 272 ("[S]uccessful challenges to the proportionality
of particular sentences have been exceedingly rare"). And
they will only "'rarely'" find it necessary to "'engage in
extended analysis'" before rejecting a claim that a sentence
is "grossly disproportionate." *Harmelin, supra,* at 1004
(KENNEDY, J., concurring in part and concurring in judg-
ment) (quoting *Solem, supra,* at 290, n. 16).

The plurality applies JUSTICE KENNEDY's analytical
framework in *Harmelin, supra,* at 1004–1005 (opinion con-
curring in part and concurring in judgment). *Ante,* at 23–
24. And, for present purposes, I will consider Ewing's
Eighth Amendment claim on those terms. But see *ante,*
at 32–33, n. 1 (STEVENS, J., dissenting). To implement this
approach, courts faced with a "gross disproportionality"
claim must first make "a threshold comparison of the crime
committed and the sentence imposed." *Harmelin, supra,* at
1005 (KENNEDY, J., concurring in part and concurring in
judgment). If a claim crosses that threshold—itself a *rare*
occurrence—then the court should compare the sentence at
issue to other sentences "imposed on other criminals" in the
same, or in other, jurisdictions. *Solem, supra,* at 290–291;

*Harmelin,* 501 U. S., at 1005 (KENNEDY, J., concurring in part and concurring in judgment). The comparative analysis will "validate" or invalidate "an initial judgment that a sentence is grossly disproportionate to a crime." *Ibid.*

I recognize the warnings implicit in the Court's frequent repetition of words such as "rare." Nonetheless I believe that the case before us is a "rare" case—one in which a court can say with reasonable confidence that the punishment is "grossly disproportionate" to the crime.

## II

Ewing's claim crosses the gross disproportionality "threshold." First, precedent makes clear that Ewing's sentence raises a serious disproportionality question. Ewing is a recidivist. Hence the two cases most directly in point are those in which the Court considered the constitutionality of recidivist sentencing: *Rummel* and *Solem.* Ewing's claim falls between these two cases. It is stronger than the claim presented in *Rummel,* where the Court upheld a recidivist's sentence as constitutional. It is weaker than the claim presented in *Solem,* where the Court struck down a recidivist sentence as unconstitutional.

Three kinds of sentence-related characteristics define the relevant comparative spectrum: (a) the length of the prison term in real time, *i. e.,* the time that the offender is likely actually to spend in prison; (b) the sentence-triggering criminal conduct, *i. e.,* the offender's actual behavior or other offense-related circumstances; and (c) the offender's criminal history. See *Rummel, supra,* at 265–266, 269, 276, 278, 280–281 (using these factors); *Solem, supra,* at 290–303 (same). Cf. United States Sentencing Commission, Guidelines Manual ch. 1, pt. A, intro., n. 5 (Nov. 1987) (USSG) (empirical study of "summary reports of some 40,000 convictions [and] a sample of 10,000 augmented presentence reports" leads to sentences based primarily upon (a) offense characteristics and (b) offender's criminal record); see *id.,* p. s. 3.

In *Rummel,* the Court held constitutional (a) a sentence of life imprisonment *with parole available within 10 to 12 years,* (b) for the offense of obtaining $120 by false pretenses, (c) committed by an offender with two prior felony convictions (involving small amounts of money). 445 U. S. 263; *ante,* at 21. In *Solem,* the Court held unconstitutional (a) a sentence of life imprisonment *without parole,* (b) for the crime of writing a $100 check on a nonexistent bank account, (c) committed by an offender with six prior felony convictions (including three for burglary). 463 U. S. 277; *ante,* at 22–23. Which of the three pertinent comparative factors made the constitutional difference?

The third factor, prior record, cannot explain the difference. The offender's prior record was *worse* in *Solem,* where the Court found the sentence too long, than in *Rummel,* where the Court upheld the sentence. The second factor, offense conduct, cannot explain the difference. The nature of the triggering offense—viewed in terms of the actual monetary loss—in the two cases was about the same. The one critical factor that explains the difference in the outcome is the length of the likely prison term measured in real time. In *Rummel,* where the Court upheld the sentence, the state sentencing statute authorized parole for the offender, Rummel, after 10 or 12 years. 445 U. S., at 280; *id.,* at 293 (Powell, J., dissenting). In *Solem,* where the Court struck down the sentence, the sentence required the offender, Helm, to spend the rest of his life in prison.

Now consider the present case. The third factor, *offender characteristics*—i. e., prior record—does not differ significantly here from that in *Solem.* Ewing's prior record consists of four prior felony convictions (involving three burglaries, one with a knife) contrasted with Helm's six prior felony convictions (including three burglaries, though none with weapons). The second factor, *offense behavior,* is worse than that in *Solem,* but only to a degree. It would be difficult to say that the actual behavior itself here (shop-

lifting) differs significantly from that at issue in *Solem* (passing a bad check) or in *Rummel* (obtaining money through false pretenses). Rather the difference lies in the *value* of the goods obtained. That difference, measured in terms of the most relevant feature (loss to the victim, *i. e.*, wholesale value) and adjusted for the irrelevant feature of inflation, comes down (in 1979 values) to about $379 here compared with $100 in *Solem,* or (in 1973 values) to $232 here compared with $120.75 in *Rummel.* See USSG § 2B1.1, comment., n. 2(A)(i) (Nov. 2002) (loss to victim properly measures value of goods unlawfully taken); U. S. Dept. of Labor, Bureau of Labor Statistics, Inflation and Consumer Spending, Inflation Calculator (Jan. 23, 2003), http://www.bls.gov (hereinafter Inflation Calculator). Alternatively, if one measures the inflation-adjusted value difference in terms of the golf clubs' sticker price, it comes down to $505 here compared to $100 in *Solem,* or $309 here compared to $120.75 in *Rummel.* See Inflation Calculator.

The difference in *length* of the real prison term—the first, and critical, factor in *Solem* and *Rummel*—is considerably more important. Ewing's sentence here amounts, in real terms, to at least 25 years without parole or good-time credits. That sentence is considerably shorter than Helm's sentence in *Solem,* which amounted, in real terms, to life in prison. Nonetheless Ewing's real prison term is more than twice as long as the term at issue in *Rummel,* which amounted, in real terms, to at least 10 or 12 years. And, Ewing's sentence, unlike Rummel's (but like Helm's sentence in *Solem*), is long enough to consume the productive remainder of almost any offender's life. (It means that Ewing himself, seriously ill when sentenced at age 38, will likely die in prison.)

The upshot is that the length of the real prison term—the factor that explains the *Solem*/*Rummel* difference in outcome—places Ewing closer to *Solem* than to *Rummel,* though the greater value of the golf clubs that Ewing stole

moves Ewing's case back slightly in *Rummel's* direction. Overall, the comparison places Ewing's sentence well within the twilight zone between *Solem* and *Rummel*—a zone where the argument for unconstitutionality is substantial, where the cases themselves cannot determine the constitutional outcome.

Second, Ewing's sentence on its face imposes one of the most severe punishments available upon a recidivist who subsequently engaged in one of the less serious forms of criminal conduct. See *infra*, at 44–45. I do not deny the seriousness of shoplifting, which an *amicus curiae* tells us costs retailers in the range of $30 billion annually. Brief for California District Attorneys Association as *Amicus Curiae* 27. But consider that conduct in terms of the factors that this Court mentioned in *Solem*—the "harm caused or threatened to the victim or society," the "absolute magnitude of the crime," and the offender's "culpability." 463 U. S., at 292–293. In respect to all three criteria, the sentence-triggering behavior here ranks well toward the bottom of the criminal conduct scale.

The Solicitor General has urged us to consider three other criteria: the "frequency" of the crime's commission, the "ease or difficulty of detection," and "the degree to which the crime may be deterred by differing amounts of punishment." Brief for United States as *Amicus Curiae* 24–25. When considered in terms of these criteria—or at least the latter two—the triggering conduct also ranks toward the bottom of the scale. Unlike, say, drug crimes, shoplifting often takes place in stores open to other customers whose presence, along with that of store employees or cameras, can help to detect the crime. Nor is there evidence presented here that the law enforcement community believes lengthy prison terms necessary adequately to deter shoplifting. To the contrary, well-publicized instances of shoplifting suggest that the offense is often punished without any prison sentence at all. On the other hand, shoplifting is a frequently com-

mitted crime; but "frequency," standing alone, cannot make a critical difference. Otherwise traffic offenses would warrant even more serious punishment.

This case, of course, involves shoplifting engaged in by a *recidivist.* One might argue that *any* crime committed by a recidivist is a serious crime potentially warranting a 25-year sentence. But this Court rejected that view in *Solem,* and in *Harmelin,* with the recognition that "no penalty is *per se* constitutional." *Solem, supra,* at 290; *Harmelin,* 501 U. S., at 1001 (KENNEDY, J., concurring in part and concurring in judgment). Our cases make clear that, in cases involving recidivist offenders, we must focus upon "the [offense] that triggers the life sentence," with recidivism playing a "relevant," but not necessarily determinative, role. *Solem, supra,* at 296, n. 21; see *Witte* v. *United States,* 515 U. S. 389, 402, 403 (1995) (the recidivist defendant is "punished only for the offense of conviction," which "'is considered to be an aggravated offense because a repetitive one'" (quoting *Gryger* v. *Burke,* 334 U. S. 728, 732 (1948))). And here, as I have said, that offense is among the less serious, while the punishment is among the most serious. Cf. *Rummel,* 445 U. S., at 288 (Powell, J., dissenting) (overtime parking violation cannot trigger a life sentence even for a serious recidivist).

Third, some objective evidence suggests that many experienced judges would consider Ewing's sentence disproportionately harsh. The United States Sentencing Commission (having based the federal Sentencing Guidelines primarily upon its review of how judges had actually sentenced offenders) does not include shoplifting (or similar theft-related offenses) among the crimes that might trigger especially long sentences for recidivists, see USSG § 4B1.1 (Nov. 2002) (Guideline for sentencing "career offenders"); *id.,* ch. 1, pt. A, intro., n. 5 (sentences based in part upon Commission's review of "summary reports of some 40,000 convictions [and] a sample of 10,000 augmented presentence reports"); see also

*infra*, at 45, nor did Congress include such offenses among triggering crimes when it sought sentences "at or near the statutory maximum" for certain recidivists, S. Rep. No. 98–225, p. 175 (1983); 28 U. S. C. § 994(h) (requiring sentence "at or near the maximum" where triggering crime is crime of "violence" or drug related); 18 U. S. C. § 3559(c) (grand theft not among triggering or "strike" offenses under federal "three strikes" law); see *infra*, at 45–46. But see 28 U. S. C. § 994(i)(1) (requiring "a substantial term of imprisonment" for those who have "a history of two or more prior . . . felony convictions").

Taken together, these three circumstances make clear that Ewing's "gross disproportionality" argument is a strong one. That being so, his claim *must* pass the "threshold" test. If it did not, what would be the function of the test? A threshold test must permit *arguably* unconstitutional sentences, not only *actually* unconstitutional sentences, to pass the threshold—at least where the arguments for unconstitutionality are unusually strong ones. A threshold test that blocked every ultimately invalid constitutional claim—even strong ones—would not be a *threshold* test but a *determinative* test. And, it would be a *determinative* test that failed to take account of highly pertinent sentencing information, namely, comparison with other sentences, *Solem, supra*, at 291–292, 298–300. Sentencing comparisons are particularly important because they provide proportionality review with *objective* content. By way of contrast, a threshold test makes the assessment of constitutionality highly subjective. And, of course, so to transform that *threshold* test would violate this Court's earlier precedent. See 463 U. S., at 290, 291–292; *Harmelin, supra*, at 1000, 1005 (KENNEDY, J., concurring in part and concurring in judgment).

## III

Believing Ewing's argument a strong one, sufficient to pass the threshold, I turn to the comparative analysis. A

comparison of Ewing's sentence with other sentences requires answers to two questions. First, how would other jurisdictions (or California at other times, *i. e.*, without the three strikes penalty) punish the *same offense conduct?* Second, upon what other conduct would other jurisdictions (or California) impose the *same prison term?* Moreover, since hypothetical punishment is beside the point, the relevant prison time, for comparative purposes, is *real* prison time, *i. e.*, the time that an offender must *actually serve.*

Sentencing statutes often shed little light upon real prison time. That is because sentencing laws normally set *maximum* sentences, giving the sentencing judge discretion to choose an actual sentence within a broad range, and because many States provide good-time credits and parole, often permitting release after, say, one-third of the sentence has been served, see, *e. g.*, Alaska Stat. § 33.20.010(a) (2000); Conn. Gen. Stat. § 18–7a (1998). Thus, the statutory maximum is rarely the sentence imposed, and the sentence imposed is rarely the sentence that is served. For the most part, the parties' briefs discuss sentencing statutes. Nonetheless, that discussion, along with other readily available information, validates my initial belief that Ewing's sentence, comparatively speaking, is extreme.

As to California itself, we know the following: First, between the end of World War II and 1994 (when California enacted the three strikes law, *ante*, at 15), no one like Ewing could have served more than *10* years in prison. We know that for certain because the maximum sentence for Ewing's crime of conviction, grand theft, was for most of that period 10 years. Cal. Penal Code Ann. §§ 484, 489 (West 1970); see Cal. Dept. of Corrections, Offender Information Services, Administrative Services Division, Historical Data for Time Served by Male Felons Paroled from Institutions: 1945 Through 1981, p. 11 (1982) (Table 10) (hereinafter Historical Data for Time Served by California Felons), Lodging of Petitioner. From 1976 to 1994 (and currently, absent application

of the three strikes penalty), a Ewing-type offender would have received a maximum sentence of four years. Cal. Penal Code Ann. § 489 (West 1999), § 667.5(b) (West Supp. 2002). And we know that California's "habitual offender" laws did not apply to grand theft. §§ 644(a), (b) (West 1970) (repealed 1977). We also know that the time that any offender actually served was likely far less than 10 years. This is because statistical data show that the median time actually served for grand theft (other than auto theft) was about two years, and 90 percent of all those convicted of that crime served less than three or four years. Historical Data for Time Served by California Felons 11 (Table 10).

Second, statistics suggest that recidivists *of all sorts* convicted during that same time period in California served a small fraction of Ewing's real-time sentence. On average, recidivists served three to four additional (recidivist-related) years in prison, with 90 percent serving less than an additional real seven to eight years. *Id.*, at 22 (Table 21).

Third, we know that California has reserved, and still reserves, Ewing-type prison time, *i. e.*, at least 25 real years in prison, for criminals convicted of crimes far worse than was Ewing's. Statistics for the years 1945 to 1981, for example, indicate that typical (nonrecidivist) male first-degree murderers served between 10 and 15 real years in prison, with 90 percent of all such murderers serving less than 20 real years. *Id.*, at 3 (Table 2). Moreover, California, which has moved toward a real-time sentencing system (where the statutory punishment approximates the time served), still punishes far less harshly those who have engaged in far more serious conduct. It imposes, for example, upon nonrecidivists guilty of arson causing great bodily injury a maximum sentence of nine years in prison, Cal. Penal Code Ann. § 451(a) (West 1999) (prison term of 5, 7, or 9 years for arson that causes great bodily injury); it imposes upon those guilty of voluntary manslaughter a maximum sentence of 11 years, § 193 (prison term of 3, 6, or 11 years for voluntary man-

slaughter). It reserves the sentence that it here imposes upon (former-burglar-now-golf-club-thief) Ewing for non-recidivist, first-degree murderers. See § 190(a) (West Supp. 2003) (sentence of 25 years to life for first-degree murder).

As to other jurisdictions, we know the following: The United States, bound by the federal Sentencing Guidelines, would impose upon a recidivist, such as Ewing, a sentence that, in any ordinary case, would not exceed 18 months in prison. USSG § 2B1.1(a) (Nov. 1999) (assuming a base offense level of 6, a criminal history of VI, and no mitigating or aggravating adjustments); id., ch. 5, pt. A, Sentencing Table. The Guidelines, based in part upon a study of some 40,000 actual federal sentences, see supra, at 37, 41, reserve a Ewing-type sentence for Ewing-type recidivists who currently commit such crimes as murder, § 2A1.2; air piracy, § 2A5.1; robbery (involving the discharge of a firearm, serious bodily injury, and about $1 million), § 2B3.1; drug offenses involving more than, for example, 20 pounds of heroin, § 2D1.1; aggravated theft of more than $100 million, § 2B1.1; and other similar offenses. The Guidelines reserve 10 years of real prison time (with good time)—less than 40 percent of Ewing's sentence—for Ewing-type recidivists who go on to commit, for instance, voluntary manslaughter, § 2A1.3; aggravated assault with a firearm (causing serious bodily injury and motivated by money), § 2A2.2; kidnaping, § 2A4.1; residential burglary involving more than $5 million, § 2B2.1; drug offenses involving at least one pound of cocaine, § 2D1.1; and other similar offenses. Ewing also would not have been subject to the federal "three strikes" law, 18 U. S. C. § 3559(c), for which grand theft is not a triggering offense.

With three exceptions, see infra, at 46–47, we do not have before us information about actual time served by Ewing-type offenders in other States. We do know, however, that the law would make it legally impossible for a Ewing-type offender to serve more than 10 years in prison in 33 jurisdictions, as well as the federal courts, see Appendix,

Part A, *infra*, more than 15 years in 4 other States, see Appendix, Part B, *infra*, and more than 20 years in 4 additional States, see Appendix, Part C, *infra*. In nine other States, the law *might* make it legally possible to impose a sentence of 25 years or more, see Appendix, Part D, *infra*—though that fact by itself, of course, does not mean that judges have actually done so. But see *infra* this page. I say "might" because the law in five of the nine last mentioned States restricts the sentencing judge's ability to impose a term so long that, with parole, it would amount to at least 25 years of actual imprisonment. See Appendix, Part D, *infra*.

We also know that California, the United States, and other States supporting California in this case, despite every incentive to find someone else like Ewing who will have to serve, or who has actually served, a real prison term anywhere approaching that imposed upon Ewing, have come up with precisely three examples. Brief for United States as *Amicus Curiae* 28–29, n. 13. The Government points to *Ex parte Howington*, 622 So. 2d 896 (Ala. 1993), where an Alabama court sentenced an offender with three prior burglary convictions and two prior grand theft convictions to "life" for the theft of a tractor-trailer. The Government also points to *State* v. *Heftel*, 513 N. W. 2d 397 (S. D. 1994), where a South Dakota court sentenced an offender with seven prior felony convictions to 50 years' imprisonment for theft. And the Government cites *Sims* v. *State*, 107 Nev. 438, 814 P. 2d 63 (1991), where a Nevada court sentenced a defendant with three prior felony convictions (including armed robbery) and nine misdemeanor convictions to life without parole for the theft of a purse and wallet containing $476.

The first of these cases, *Howington*, is beside the point, for the offender was eligible for parole after 10 years (as in *Rummel*), not 25 years (as here). Ala. Code § 15–22–28(e) (West 1982). The second case, *Heftel*, is factually on point, but it is not legally on point, for the South Dakota courts did not consider the constitutionality of the sentence. 513 N. W.

2d, at 401. The third case, *Sims,* is on point both factually and legally, for the Nevada Supreme Court (by a vote of 3 to 2) found the sentence constitutional. I concede that example—a single instance of a similar sentence imposed outside the context of California's three strikes law, out of a prison population now approaching two million individuals. U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Prison Statistics (Jan. 8, 2003), http://www.ojp.usdoj.gov/bjs/prisons.htm (available in Clerk of Court's case file).

The upshot is that comparison of other sentencing practices, both in other jurisdictions and in California at other times (or in respect to other crimes), validates what an initial threshold examination suggested. Given the information available, given the state and federal parties' ability to provide additional contrary data, and given their failure to do so, we can assume for constitutional purposes that the following statement is true: Outside the California three strikes context, Ewing's recidivist sentence is virtually unique in its harshness for his offense of conviction, and by a considerable degree.

## IV

This is not the end of the matter. California sentenced Ewing pursuant to its "three strikes" law. That law represents a deliberate effort to provide stricter punishments for recidivists. Cal. Penal Code Ann. § 667(b) (West 1999) ("It is the intent of the Legislature . . . to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses"); *ante,* at 24. And, it is important to consider whether special criminal justice concerns related to California's three strikes policy might justify including Ewing's theft within the class of triggering criminal conduct (thereby imposing a severe punishment), even if Ewing's sentence would otherwise seem disproportionately harsh.

Cf. *Harmelin,* 501 U. S., at 998–999, 1001 (noting "the primacy of the legislature" in making sentencing policy).

I can find no such special criminal justice concerns that might justify this sentence. The most obvious potential justification for bringing Ewing's theft within the ambit of the statute is administrative. California must draw some kind of workable line between conduct that will trigger, and conduct that will not trigger, a "three strikes" sentence. "But the fact that a line has to be drawn somewhere does not justify its being drawn anywhere." *Pearce* v. *Commissioner,* 315 U. S. 543, 558 (1942) (Frankfurter, J., dissenting). The statute's administrative objective would seem to be one of separating more serious, from less serious, triggering criminal conduct. Yet the statute does not do that job particularly well.

The administrative line that the statute draws separates "felonies" from "misdemeanors." See Brief for Respondent 6 ("The California statute relies, fundamentally, on traditional classifications of certain crimes as felonies"). Those words suggest a graduated difference in degree. But an examination of how California applies these labels in practice to criminal conduct suggests that the offenses do not necessarily reflect those differences. See *United States* v. *Watson,* 423 U. S. 411, 438–441 (1976) (Marshall, J., dissenting) (felony/misdemeanor distinction often reflects history, not logic); *Rummel,* 445 U. S., at 284 ("The most casual review of the various criminal justice systems now in force in the 50 States of the Union shows that the line dividing felony theft from petty larceny, a line usually based on the value of the property taken, varies markedly from one State to another"). Indeed, California uses those words in a way unrelated to the seriousness of offense conduct in a set of criminal statutes called " 'wobblers,' " see *ante,* at 16, one of which is at issue in this case.

Most "wobbler" statutes classify the same criminal conduct either as a felony or as a misdemeanor, depending upon

the actual punishment imposed, Cal. Penal Code Ann. §§ 17(a), (b) (West 1999); *ante*, at 16–17, which in turn depends primarily upon whether "the rehabilitation of the convicted defendant" either does or does not "require" (or would or would not "be adversely affected by") "incarceration in a state prison as a felon." *In re Anderson*, 69 Cal. 2d 613, 664–665, 447 P. 2d 117, 152 (1968) (Tobriner, J., concurring in part and dissenting in part); *ante*, at 29. In such cases, the felony/misdemeanor classification turns primarily upon the nature of the offender, not the comparative seriousness of the offender's conduct.

A subset of "wobbler" statutes, including the "petty theft with a prior" statute, Cal. Penal Code Ann. § 666 (West Supp. 2002), defining the crime in the companion case, *Lockyer* v. *Andrade, post*, p. 63, authorizes the treatment of otherwise misdemeanor conduct, see Cal. Penal Code Ann. § 490 (West 1999), as a felony only when the offender has previously committed a property crime. Again, the distinction turns upon characteristics of the offender, not the specific offense conduct at issue.

The result of importing this kind of distinction into California's three strikes statute is a series of anomalies. One anomaly concerns the seriousness of the triggering behavior. "Wobbler" statutes cover a wide variety of criminal behavior, ranging from assault with a deadly weapon, § 245, vehicular manslaughter, § 193(c)(1), and money laundering, § 186.10(a), to the defacement of property with graffiti, § 594(b)(2)(A) (West Supp. 2002), or stealing more than $100 worth of chickens, nuts, or avocados, § 487(b)(1)(A) (West Supp. 2003); § 489 (West 1999). Some of this behavior is obviously less serious, even if engaged in twice, than other criminal conduct that California statutes classify as pure misdemeanors, such as reckless driving, Cal. Veh. Code Ann. § 23103 (West Supp. 2003); § 23104(a) (West 2000) (reckless driving causing bodily injury), the use of force or threat of force to interfere with another's civil rights, Cal. Penal Code

Ann. § 422.6 (West 1999), selling poisoned alcohol, § 347b, child neglect, § 270, and manufacturing or selling false government documents with the intent to conceal true citizenship, § 112(a) (West Supp. 2002).

Another anomaly concerns temporal order. An offender whose triggering crime is his third crime likely will *not* fall within the ambit of the three strikes statute provided that (a) his *first* crime was chicken theft worth more than $100, and (b) he subsequently graduated to more serious crimes, say, crimes of violence. That is because such chicken theft, when a first offense, will likely be considered a misdemeanor. A similar offender likely *will* fall within the scope of the three strikes statute, however, if such chicken theft was his *third* crime. That is because such chicken theft, as a third offense, will likely be treated as a felony.

A further anomaly concerns the offender's criminal record. California's "wobbler" "petty theft with a prior" statute, at issue in *Lockyer* v. *Andrade, post,* p. 63, classifies a petty theft as a "felony" if, but only if, the offender has a prior record that includes at least one conviction for certain theft-related offenses. Cal. Penal Code Ann. § 666 (West Supp. 2002). Thus a violent criminal who has committed two violent offenses and then steals $200 will *not* fall within the ambit of the three strikes statute, for his prior record reveals no similar *property* crimes. A similar offender *will* fall within the scope of the three strikes statute, however, if that offender, instead of having committed two previous violent crimes, has committed one previous violent crime and one previous petty theft. (Ewing's conduct would have brought him within the realm of the petty theft statute prior to 1976 but for inflation.)

At the same time, it is difficult to find any strong need to define the lower boundary as the State has done. The three strikes statute itself, when defining prior "strikes," simply lists the kinds of serious criminal conduct that falls within the definition of a "strike." § 667.5(c) (listing "violent" felon-

ies); § 1192.7(c) (West Supp. 2003) (listing "serious" felonies). There is no obvious reason why the statute could not enumerate, consistent with its purposes, the relevant triggering crimes. Given that possibility and given the anomalies that result from California's chosen approach, I do not see how California can justify on *administrative* grounds a sentence as seriously disproportionate as Ewing's. See Parts II and III, *supra.*

Neither do I see any other way in which inclusion of Ewing's conduct (as a "triggering crime") would further a significant criminal justice objective. One might argue that those who commit several *property* crimes should receive long terms of imprisonment in order to "incapacitate" them, *i. e.,* to prevent them from committing further crimes in the future. But that is not the object of this particular three strikes statute. Rather, as the plurality says, California seeks "'to reduce *serious* and *violent* crime.'" *Ante,* at 24 (quoting Ardaiz, California's Three Strikes Law: History, Expectations, Consequences, 32 McGeorge L. Rev. 1 (2000) (emphasis added)). The statute's definitions of both kinds of crime include crimes against the person, crimes that create danger of physical harm, and drug crimes. See, *e. g.,* Cal. Penal Code Ann. § 667.5(c)(1) (West Supp. 2002), § 1192.7(c)(1) (West Supp. 2003) (murder or voluntary manslaughter); § 667.5(c)(21) (West Supp. 2002), § 1192.7(c)(18) (West Supp. 2003) (first-degree burglary); § 1192.7(c)(24) (selling or giving or offering to sell or give heroin or cocaine to a minor). They do not include even serious crimes against property, such as obtaining large amounts of money, say, through theft, embezzlement, or fraud. Given the omission of vast categories of property crimes—including grand theft (unarmed)—from the "strike" definition, one cannot argue, on *property-crime-related incapacitation grounds,* for inclusion of Ewing's crime among the triggers.

Nor do the remaining criminal law objectives seem relevant. No one argues for Ewing's inclusion within the ambit

of the three strikes statute on grounds of "retribution." Cf. Vitiello, Three Strikes: Can We Return to Rationality? 87 J. Crim. L. & C. 395, 427 (1997) (California's three strikes law, like other "[h]abitual offender statutes[, is] not retributive" because the term of imprisonment is "imposed without regard to the culpability of the offender or [the] degree of social harm caused by the offender's behavior," and "has little to do with the gravity of the offens[e]"). For reasons previously discussed, in terms of "deterrence," Ewing's 25-year term amounts to overkill. See Parts II and III, *supra*. And "rehabilitation" is obviously beside the point. The upshot is that, in my view, the State cannot find in its three strikes law a special criminal justice need sufficient to rescue a sentence that other relevant considerations indicate is unconstitutional.

## V

JUSTICE SCALIA and JUSTICE THOMAS argue that we should not review for gross disproportionality a sentence to a term of years. *Ante,* at 31 (SCALIA, J., concurring in judgment); *ante,* at 32 (THOMAS, J., concurring in judgment). Otherwise, we make it too difficult for legislators and sentencing judges to determine just when their sentencing laws and practices pass constitutional muster.

I concede that a bright-line rule would give legislators and sentencing judges more guidance. But application of the Eighth Amendment to a sentence of a term of years requires a case-by-case approach. And, in my view, like that of the plurality, meaningful enforcement of the Eighth Amendment demands that application—even if only at sentencing's outer bounds.

A case-by-case approach can nonetheless offer guidance through example. Ewing's sentence is, at a minimum, 2 to 3 times the length of sentences that other jurisdictions would impose in similar circumstances. That sentence itself is sufficiently long to require a typical offender to spend virtually all the remainder of his active life in prison. These and the

other factors that I have discussed, along with the questions that I have asked along the way, should help to identify "gross disproportionality" in a fairly objective way—at the outer bounds of sentencing.

In sum, even if I accept for present purposes the plurality's analytical framework, Ewing's sentence (life imprisonment with a minimum term of 25 years) is grossly disproportionate to the triggering offense conduct—stealing three golf clubs—Ewing's recidivism notwithstanding.

For these reasons, I dissent.

## APPENDIX TO OPINION OF BREYER, J.

### A

Thirty-three jurisdictions, as well as the federal courts, have laws that would make it impossible to sentence a Ewing-type offender to more than 10 years in prison:[1]

Federal: 12 to 18 months. USSG § 2B1.1 (Nov. 1999); *id.,* ch. 5, pt. A, Sentencing Table.

Alaska: three to five years; presumptive term of three years. Alaska Stat. §§ 11.46.130(a)(1), (c), 12.55.125(e) (2000).

Arizona: four to six years; presumptive sentence of five years. Ariz. Rev. Stat. Ann. §§ 13–604(C), 13–1802(E) (West 2001).

Connecticut: 1 to 10 years. Conn. Gen. Stat. §§ 53a–35a(6), 53a–40(j), 53a–124(a)(2) (2001).

Delaware: not more than two years. Del. Code Ann., Tit. 11, § 840(d) (Supp. 2000); § 4205(b)(7) (1995). Recidivist offender penalty not applicable. See § 4214; *Buckingham* v. *State,* 482 A. 2d 327 (Del. 1984).

District of Columbia: not more than 10 years. D. C. Code Ann. § 22–3212(a) (West 2001). Recidivist offender penalty

---

[1] Throughout Appendix, Parts A–D, the penalties listed for each jurisdiction are those pertaining to imprisonment and do not reflect any possible fines or other forms of penalties applicable under the laws of the jurisdiction.

not applicable. See § 22–1804a(c)(2) (West 2001) (amended 2001).

Florida: not more than 10 years. Fla. Stat. Ann. §§ 775.084(1)(a), (4)(a)(3) (West 2000) (amended 2002); § 812.014(c)(1) (West 2000).

Georgia: 10 years. Ga. Code Ann. § 16–8–12(a)(1) (1996); § 17–10–7(a) (Supp. 1996).

Hawaii: 20 months. Haw. Rev. Stat. §§ 708–831(1)(b), 706–606.5(1)(a)(iv), (7)(a) (Supp. 2001).

Idaho: 1 to 14 years. Idaho Code §§ 18–2403, 18–2407(b)(1), 18–2408(2)(a) (1948–1997). Recidivist/habitual offender penalty of five years to life in prison, § 19–2514, likely not applicable. Idaho has a general rule that " 'convictions entered the same day or charged in the same information should count as a single conviction for purposes of establishing habitual offender status.' " *State* v. *Harrington,* 133 Idaho 563, 565, 990 P. 2d 144, 146 (App. 1999) (quoting *State* v. *Brandt,* 110 Idaho 341, 344, 715 P. 2d 1011, 1014 (App. 1986)). However, "the nature of the convictions in any given situation must be examined to make certain that [this] general rule is appropriate." *Ibid.* In this case, Ewing's prior felony convictions stemmed from acts committed at the same apartment complex, and three of the four felonies were committed within a day of each other; the fourth offense was committed five weeks earlier. See App. 6; Tr. 45–46 (Information, Case No. NA018343–01 (Cal. Super. Ct.) (available in Clerk of Court's case file)). A review of Idaho case law suggests that this case is factually distinguishable from cases in which the Idaho courts have declined to adhere to the general rule. See, *e. g., Brandt, supra,* at 343, 344, 715 P. 2d, at 1013, 1014 (three separately charged property offenses involving three separate homes and different victims committed "during a two-month period"); *State* v. *Mace,* 133 Idaho 903, 907, 994 P. 2d 1066, 1070 (App. 2000) (unrelated crimes (grand theft and DUI) committed on different dates in different counties); *State* v. *Smith,* 116 Idaho 553, 560, 777

P. 2d 1226, 1233 (App. 1989) (separate and distinguishable crimes committed on different victims in different counties).

Illinois: two to five years. Ill. Comp. Stat., ch. 730, § 5/ 5–8–1(a)(6) (Supp. 2001); ch. 720, § 5/16–1(b)(4). Recidivist offender penalty not applicable. § 5/33B–1(a) (2000).

Indiana: 18 months (with not more than 18 months added for aggravating circumstances). Ind. Code § 35–43–4–2(a) (1993); § 35–50–2–7(a). Recidivist offender penalty not applicable. See § 35–50–2–8 (amended 2001).

Iowa: three to five years. Iowa Code Ann. §§ 714.2(2), 902.9(5) (West Supp. 2002); § 902.8 (West 1994).

Kansas: 9 to 11 months. Kan. Stat. Ann. §§ 21–3701(b)(2), 21–4704(a) (1995). Recidivist offender penalty not applicable. See § 21–4504(e)(3).

Kentucky: 5 to 10 years. Ky. Rev. Stat. Ann. § 514.030(2) (Lexis Supp. 2002); §§ 532.060(2)(c), (d), 532.080(2), (5) (Lexis 1999).

Maine: less than one year. Me. Rev. Stat. Ann., Tit. 17–A, § 353 (West 1983); § 362(4)(B) (West Supp. 2000) (amended 2001); § 1252(2)(D) (West 1983 and Supp. 2002). Recidivist offender penalty not applicable. See § 1252(4–A) (West Supp. 2000) (amended 2001).

Massachusetts: not more than five years. Mass. Gen. Laws, ch. 266, § 30(1) (West 2000). Recidivist offender penalty not applicable. See ch. 279, § 25 (West 1998); *Commonwealth* v. *Hall,* 397 Mass. 466, 468, 492 N. E. 2d 84, 85 (1986).

Minnesota: not more than five years. Minn. Stat. § 609.52, subd. 3(3)(a) (2002). Recidivist offender penalty not applicable. See § 609.1095, subd. 2.

Mississippi: not more than five years. Miss. Code Ann. § 97–17–41(1)(a) (Lexis 1973–2000). Recidivist offender penalty not applicable. See § 99–19–81.

Nebraska: not more than five years. Neb. Rev. Stat. § 28– 105(1) (2000 Cum. Supp.); § 28–518(2) (1995). Recidivist offender penalty not applicable. See § 29–2221(1).

56

New Jersey: Extended term of between 5 to 10 years (instead of three to five years, N. J. Stat. Ann. § 2C:43–6 (1995)), § 2C:43–7(a)(4) (Supp. 2002), whether offense is treated as theft, § 2C:20–2(b)(2)(a), or shoplifting, §§ 2C:20–11(b), (c)(2), because, even if Ewing's felonies are regarded as one predicate crime, Ewing has been separately convicted and sentenced for at least one other crime for which at least a 6-month sentence was authorized, § 2C:44–3(a); § 2C:44–4(c) (1995).

New Mexico: 30 months. N. M. Stat. Ann. § 30–16–20(B)(3) (1994); § 31–18–15(A)(6) (2000); § 31–18–17(B) (2000) (amended 2002).

New York: three to four years. N. Y. Penal Law § 70.06(3)(e) (West 1998); § 155.30 (West 1999).

North Carolina: 4 to 25 months (with exact sentencing range dependent on details of offender's criminal history). N. C. Gen. Stat. §§ 15A–1340.14, 15A–1340.17(c), (d), 14–72(a) (2001). Recidivist offender penalty not applicable. See §§ 14–7.1, 14–7.6.

North Dakota: not more than 10 years. N. D. Cent. Code § 12.1–23–05(2)(a) (1997); §§ 12.1–32–09(1), (2)(c) (1997) (amended 2001).

Ohio: 6 to 12 months. Ohio Rev. Code Ann. §§ 2913.02(B)(2), 2929.14(A)(5) (West Supp. 2002). No general recidivist statute.

Oregon: not more than five years. Ore. Rev. Stat. § 161.605 (1997); Ore. Rev. Stat. Ann. §§ 164.055(1)(a), (3) (Supp. 1998). No general recidivist statute.

Pennsylvania: not more than five years (if no more than one prior theft was "retail theft"); otherwise, not more than seven years. Pa. Stat. Ann., Tit. 18, §§ 1103(3), 1104(1) (Purdon 1998); §§ 3903(b), 3929(b)(1)(iii)–(iv) (Purdon Supp. 2002); § 3921 (Purdon 1983). Recidivist offender penalty not applicable. See 42 Pa. Cons. Stat. § 9714(a)(1) (1998).

Rhode Island: not more than 10 years. R. I. Gen. Laws § 11–41–5(a) (2002). Recidivist offender penalty not applicable. See § 12–19–21(a).

South Carolina: not more than five years. S. C. Code Ann. §§ 16–13–30, 16–13–110(B)(2) (West 2001 Cum. Supp.). Recidivist offender penalty not applicable. See § 17–25–45.

Tennessee: four to eight years. Tenn. Code Ann. §§ 39–14–105(3), 40–35–106(a)(1), (c), 40–35–112(b)(4) (1997).

Utah: not more than five years. Utah Code Ann. § 76–3–203(3) (1999) (amended 2000); § 76–6–412(1)(b)(i) (1999). Recidivist offender penalty not applicable. See § 76–3–203.5 (Supp. 2002).

Washington: not more than 14 months (with exact sentencing range dependent on details of offender score), Wash. Rev. Code §§ 9A.56.040(1)(a), (2) (2000); §§ 9.94A.510(1), 9.94A.515, 9.94A.525 (2003 Supp. Pamphlet); maximum sentence of five years, §§ 9A.56.040(1)(a), (2), 9A.20.021(1)(c) (2000). Recidivist offender penalty not applicable. See §§ 9.94A.030(27), (31) (2000); § 9.94A.570 (2003 Supp. Pamphlet).

Wyoming: not more than 10 years. Wyo. Stat. Ann. § 6–3–404(a)(i) (Michie 2001). Recidivist offender penalty not applicable. See § 6–10–201(a).

B

In four other States, a Ewing-type offender could not have received a sentence of more than 15 years in prison:

Colorado: 4 to 12 years for "extraordinary aggravating circumstances" (*e. g.,* defendant on parole for another felony at the time of commission of the triggering offense). Colo. Rev. Stat. §§ 18–1–105(1)(a)(V)(A), 18–1–105(9)(a)(II), 18–4–401(2)(c) (2002). Recidivist offender penalty not applicable. See §§ 16–13–101(f)(1.5), (2) (2001).

Maryland: not more than 15 years. Md. Ann. Code, Art. 27, § 342(f)(1) (1996) (repealed 2002). Recidivist offender penalty not applicable. See § 643B.

New Hampshire: not more than 15 years. N. H. Stat. Ann. §§ 637:11(I)(a), 651:2(II)(a) (West Supp. 2002). Recidivist offender penalty not applicable. See § 651:6(I)(c).

Wisconsin: not more than 11 years (at the time of Ewing's offense). Wis. Stat. Ann. § 939.50(3)(e) (West Supp. 2002); §§ 939.62(1)(b), (2), 943.20(3)(b) (West 1996) (amended 2001). Wisconsin subsequently amended the relevant statutes so that a Ewing-type offender would only be eligible for a sentence of up to three years. See §§ 939.51(3)(a), 943.20(3)(a), 939.62(1)(a) (West Supp. 2003). And effective February 1, 2003, such an offender is eligible for a sentence of only up to two years. See §§ 939.51(3)(a), 943.20(3)(a), 939.62(1)(a).

### C

In four additional States, a Ewing-type offender could not have been sentenced to more than 20 years in prison:

Arkansas: 3 to 20 years. Ark. Code Ann. § 5–36–103(b)(2)(A) (1997); §§ 5–4–501(a)(2)(D), (e)(1) (1997) (amended 2001). Eligible for parole after serving one-third of the sentence. § 5–4–501 (1997); § 16–93–608 (1987).

Missouri: not more than 20 years. Mo. Rev. Stat. § 558.016(7)(3) (2000); § 570.030(3)(1) (2000) (amended 2002). Eligible for parole after 15 years at the latest. § 558.011(4)(1)(c).

Texas: 2 to 20 years. Tex. Penal Code Ann. §§ 12.33(a), 12.35(c)(2)(A) (1994); §§ 12.42(a)(3), 31.03(e)(4)(D) (Supp. 2003). Eligible for parole after serving one-fourth of sentence. Tex. Govt. Code Ann. § 508.145(f) (Supp. 2003).

Virginia: statutory range of 1 to 20 years (or less than 12 months at the discretion of the jury or court following bench trial), Va. Code Ann. § 18.2–95 (Supp. 2002), but discretionary sentencing guideline ranges established by the Virginia Sentencing Commission, §§ 17.1–805, 19.2–298.01 (2000), with a maximum of 6 years, 3 months, to 15 years, 7 months, see Virginia Criminal Sentencing Commission, Virginia Sentencing Guidelines Manual, Larceny—Section C Recommenda-

tion Table (6th ed. 2002) (with petitioner likely falling within the discretionary guideline range of 2 years, 1 month, to 5 years, 3 months, see Brief for Petitioner 33, n. 25). Recidivist offender penalty not applicable. See § 19.2–297.1 (2000).

### D

In nine other States, the law *might* make it legally possible to impose a sentence of 25 years or more upon a Ewing-type offender. But in five of those nine States,[2] the offender would be parole-eligible before 25 years:

Alabama: "life or any term of not less than 20 years." Ala. Code § 13A–5–9(c)(2) (Lexis Supp. 2002); §§ 13A–8–3(a), (c) (1994). Eligible for parole after the lesser of one-third of the sentence or 10 years. § 15–22–28(e) (1995).

Louisiana: Louisiana courts could have imposed a sentence of life without the possibility of parole at the time of Ewing's offense. La. Stat. Ann. §§ 14:67.10(B)(1), 14:2(4), (13)(y) (West Supp. 2003); §§ 15:529.1(A)(1)(b)(ii) and (c)(i)–(ii) (West 1992) (amended 2001). Petitioner argues that, despite the statutory authority to impose such a sentence, Louisiana courts would have carefully scrutinized his life sentence, as they had in other cases involving recidivists charged with a nonviolent crime. Brief for Petitioner 35–36, n. 29; see Brief for Families Against Mandatory Minimums as *Amicus Curiae* 24–25, and n. 21; *State* v. *Hayes*, 98–1526, p. 4 (La. App. 6/25/99), 739 So. 2d 301, 303–304 (holding that a life sentence was impermissibly excessive for a defendant convicted of theft of over $1,000, who had a prior robbery conviction). But see Brief for Respondent 45–46, n. 12 (contesting petitioner's argument). Louisiana has amended its recidivist statute to require that the triggering offense be a violent felony, and that the offender have at least two prior violent felony convictions to be eligible for a life sentence. La. Stat.

---

[2] But see discussion of relevant sentencing and parole-eligibility provisions in Louisiana, Michigan, Oklahoma, and South Dakota, *infra* this page and 60–61.

Ann. § 15:529.1(A)(1)(b)(ii) (West Supp. 2003). Under current law, a Ewing-type offender would face a sentence of 6⅔ to 20 years. §§ 14:67.10(B)(1), 15:529.1(A)(b)(i).

Michigan: "imprisonment for life or for a lesser term," Mich. Comp. Laws Ann. § 769.12(1)(a) (West 2000) (instead of "not more than 15 years," § 769.12(1)(b), as petitioner contends, see Brief for Petitioner 34, n. 26; Brief for Families Against Mandatory Minimums as *Amicus Curiae* 16–17, n. 15, 22–23, n. 20), because the triggering offense is "punishable upon a first conviction by imprisonment for a maximum term of 5 years or more," § 769.12(1)(a) (West 2000). The larceny for which Ewing was convicted was, under Michigan law, "a felony punishable by imprisonment for not more than 5 years." § 750.356(3)(a) (West Supp. 2002). Eligible for parole following minimum term set by sentencing judge. § 769.12(4) (West 2000).

Montana: 5 to 100 years. Mont. Code Ann. § 45–6–301(7)(b) (1999); §§ 46–18–501, 46–18–502(1) (2001). A Ewing-type offender would not have been subject to a minimum term of 10 years in prison (as the State suggests, Brief for Respondent 44) because Ewing does not meet the requirements of § 46–18–502(2) (must be a "persistent felony offender," as defined in § 46–18–501, at the time of the offender's previous felony conviction). See Reply Brief for Petitioner 18, n. 14. Eligible for parole after one-fourth of the term. § 46–23–201(2).

Nevada: "life without the possibility of parole," or "life with the possibility of parole [after serving] 10 years," or "a definite term of 25 years, with eligibility for parole [after serving] 10 years." Nev. Rev. Stat. §§ 207.010(1)(b)(1)–(3) (1995).

Oklahoma: not less than 20 years (at the time of Ewing's offense). Okla. Stat., Tit. 21, § 51.1(B) (West Supp. 2000) (amended in 2001 to four years to life, § 51.1(C) (West 2001)); § 1704 (West 1991) (amended 2001). Eligible for parole after serving one-third of sentence. Tit. 57, § 332.7(B) (West

2001). Thus, assuming a sentence to a term of years of up to 100 years (as in Montana, see *supra*, at 60), parole eligibility could arise as late as after 33 years.

South Dakota: maximum penalty of life imprisonment, with no minimum term. S. D. Codified Laws §22–7–8 (1998); §22–30A–17(1) (Supp. 2002). Eligible for parole after serving one-half of sentence. §24–15–5(3) (1998). Thus, assuming a sentence to a term of years of up to 100 years (as in Montana, see *supra*, at 60), parole eligibility could arise as late as after 50 years.

Vermont: "up to and including life," Vt. Stat. Ann., Tit. 13, §11 (1998), or not more than 10 years, §2501; *State* v. *Angelucci*, 137 Vt. 272, 289–290, 405 A. 2d 33, 42 (1979) (court has discretion to sentence habitual offender to the sentence that is specified for grand larceny alone). Eligible for parole after six months. Tit. 28, §501 (2000) (amended 2001).

West Virginia: Petitioner contends that he would only have been subject to a misdemeanor sentence of not more than 60 days for shoplifting, W. Va. Code §§61–3A–1, 61–3A–3(a)(2) (2000); Brief for Petitioner 31, n. 19, 33–34, n. 25. However, a Ewing-type offender could have been charged with grand larceny, see *State ex rel. Chadwell* v. *Duncil*, 196 W. Va. 643, 647–648, 474 S. E. 2d 573, 577–578 (1996) (prosecutor has discretion to charge defendant with either shoplifting or grand larceny), a felony punishable by imprisonment in the state penitentiary for 1 to 10 years (or, at the discretion of the trial court, not more than 1 year in jail). §61–3–13(a). Under West Virginia's habitual offender statute, a felon "twice before convicted . . . of a crime punishable by confinement in a penitentiary . . . . shall be sentenced to . . . life [imprisonment]," §61–11–18(c), with parole eligibility after 15 years, §62–12–13(c). *Amicus curiae* on behalf of petitioner notes that, in light of existing state-law precedents, West Virginia courts "would not countenance a sentence of life without the possibility of parole for 25 years for shoplifting golf clubs." Brief for Families Against Mandatory Minimums as *Amicus*

*Curiae* 25–26 (citing *State* v. *Barker,* 186 W. Va. 73, 74–75, 410 S. E. 2d 712, 713–714 (1991) *(per curiam);* and *State* v. *Deal,* 178 W. Va. 142, 146–147, 358 S. E. 2d 226, 230–231 (1987)).   But see Brief for Respondent 45, n. 11 (contesting that argument).