STATE v. CLIFTON

[158 N.C. App. 88 (2003)]

No error.

Judges HUNTER and CALABRIA concur.

———————————

STATE OF NORTH CAROLINA v. ALFRED DOMINIQUE CLIFTON

No. COA02-601

(Filed 20 May 2003)

**Sentencing— habitual—felon—sentence not grossly disproportionate**

A sentence of 168 to 211 months' imprisonment imposed upon defendant for each of two counts of obtaining property by false pretenses as an habitual felon was not so grossly disproportionate as to constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The fact that the State has the discretion to select whether it will prosecute the charge as a felony or a misdemeanor is not a determinative factor; the scales must include a defendant's history of recidivism as well as his current felonies.

Appeal by defendant from judgments entered 10 January 2002 by Judge Beverly T. Beal in Superior Court, Mecklenburg County. Heard in the Court of Appeals 20 February 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Stewart L. Johnson and Assistant Attorney General Amy C. Kunstling, for the State.*

*Public Defender Isabel Scott Day, by Assistant Public Defender Dean Paul Loven, for defendant.*

McGEE, Judge.

Alfred Dominique Clifton (defendant) was convicted on 10 January 2002 of two counts of obtaining property by false pretenses and of having attained the status of habitual felon. The trial court determined defendant to have a prior record level of VI and sentenced defendant to two terms of a minimum of 168 months and a maximum of 211 months active imprisonment to run consecutively. Defendant appeals.

The State's evidence at trial tended to show that on 1 August 2000 defendant purchased a 2000 Yamaha sport motorcycle and trailer from Charlotte Honda/Yamaha for $13,582.78. Defendant said he was getting a "nice size settlement" from an automobile accident in which he had been involved. Defendant gave George Dwight (Dwight), a sales department employee, a $500.00 personal check to hold the motorcycle until he could return with a certified check.

Defendant returned to Charlotte Honda/Yamaha around 3:30 p.m. Defendant and Dwight completed the bill of sale and other paperwork for the purchase. Defendant gave Dwight a certified check from Wachovia for the purchase and the $500.00 deposit was returned to defendant. When Dwight and defendant took the certified check to the cashier at Charlotte Honda/Yamaha, the cashier pointed out that the check had not been signed. Dwight gave defendant directions to the Wachovia branch located nearby. It was approaching 5:00 p.m.

Defendant later returned to Charlotte Honda/Yamaha and presented the certified check, which had now been signed. Defendant said he was able to catch a Wachovia employee just as the bank was closing. Charlotte Honda/Yamaha accepted the check; however, because it was after 5:00 p.m., Charlotte Honda/Yamaha was unable to immediately verify the check. Defendant took possession of the motorcycle and trailer that afternoon. It was later determined that the certified check was counterfeit. The Wachovia account listed did not exist and the check was not issued by Wachovia.

Two days later defendant purchased a 2000 Chevrolet Suburban from Parks Chevrolet in Charlotte. He also enrolled in the extended warranty program for the Suburban and paid for the program with a personal check from a First Union account. Defendant told Robert Mussa (Mussa), the finance director for Parks Chevrolet, that he would return later that day with a certified check for the full purchase price of $42,998.00. Mussa told defendant to bring the check by 5:00 p.m. Defendant returned to Parks Chevrolet between 6:00 and 7:00 p.m. with a certified check from Wachovia. Defendant presented the check to Mussa and the Chevrolet Suburban was released to defendant. It was later determined that the certified check had not been issued by Wachovia and that there was no such account at Wachovia. The personal check from First Union could not be verified due to problems and it was later determined that the account did not exist.

Defendant had used a similar certified check scheme on 31 July 2000 to obtain a 2000 Lincoln Navigator and a 2000 Lincoln LS from

Queen City Lincoln-Mercury in Charlotte. Defendant told the dealer that he was getting money from an automobile collision that would pay for everything. Defendant made a deposit of $5,000.00 and left to get a certified check. Defendant returned with a certified check from Wachovia in the amount of $90,065.31 and presented it to Julian McCall (McCall), general manager of Queen City Lincoln-Mercury. The Lincoln Navigator was released to defendant and defendant had another person pick up the Lincoln LS. About thirty minutes after defendant left Queen City Lincoln-Mercury, McCall discovered that the certified check could not be verified and notified the police. The police arrested the person defendant sent to pick up the Lincoln LS when the person arrived at Queen City Lincoln-Mercury. It was later determined that the certified check was counterfeit. The check was not issued by Wachovia, nor was there any such account at Wachovia.

Because the vehicle was equipped with a global positioning system, the Charlotte-Mecklenburg police located the Chevrolet Suburban defendant had obtained using the counterfeit certified check in a garage on North Tryon Street in Charlotte on 4 August 2000. When the police arrived, defendant was standing beside the Suburban with the keys in his pocket. The police discovered a helmet, several checks, and a briefcase inside the Suburban. The briefcase contained a compact disk labeled "[m]y business check writer for my software for Windows 98" and nine blank checks, purportedly certified checks from Wachovia.

Defendant admitted in a statement to the police that he obtained the certified checks from a woman he knew and that the information on the approximately $42,000.00 check and the $90,065.35 check, including the account number, came from a Wal-Mart check defendant had received from his former wife. The computer program defendant used to create these checks was the one found in his briefcase inside the Suburban. Defendant told police where to find the Lincoln Navigator, and when police went to that location, they discovered both the Lincoln Navigator obtained from Queen City Lincoln-Mercury and the Yamaha Motorcycle and trailer obtained from Charlotte Honda/Yamaha.

Defendant did not present any evidence. The jury convicted defendant of two counts of obtaining property by false pretenses.

The State presented evidence in the habitual felon proceeding tending to show that defendant had been convicted of at least three prior felonies that would qualify for habitual felon status in North

Carolina: (1) in Mecklenburg County number 92 CRS 40349, defendant was convicted on 12 August 1992 of felonious assault with a deadly weapon on a law enforcement officer; (2) in Mecklenburg County number 93 CRS 70671, defendant was convicted on 19 April 1994 of feloniously obtaining property by false pretenses; and (3) in Mecklenburg County number 95 CRS 60506, defendant was convicted on 10 April 1996 of felony escape from prison.

Defendant has failed to put forth an argument in support of assignments of error one through eleven and assignment thirteen. Those assignments of error are therefore deemed abandoned pursuant to N.C.R. App. P. 28(b)(6).

Defendant's sole argument is that the trial court erred in sentencing defendant as an habitual felon because the sentence violated the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution. We disagree. Defendant was convicted of two counts of obtaining property by false pretenses. The trial court adjudged defendant an habitual felon and sentenced him as a Class C felon. Defendant was sentenced to two consecutive terms of a minimum of 168 months to a maximum of 211 months active imprisonment. N.C. Gen. Stat. §§ 14-7.1 to -7.6 (2001) provide that a person who has three prior felony convictions may be sentenced as an habitual felon.

Defendant contends that one reason he raised this issue on appeal was to preserve the matter under *State v. Zuniga*, 336 N.C. 508, 513, 444 S.E.2d 443, 446 (1994), pending a decision of the United States Supreme Court in *Lockyer v. Andrade*, 538 U.S. 63, 155 L. Ed. 2d 144 (2003). Defendant argues that the sentence at issue in *Andrade*, 538 U.S. at ——, 155 L. Ed. 2d at 153, is similar to the sentence defendant received in the present case. However, we note the United States Supreme Court has now reversed the Ninth Circuit Court of Appeals' decision in *Andrade. Id.* at ——, 155 L. Ed. 2d at 154. The Supreme Court held that the Ninth Circuit erred when it granted the defendant a certificate of appealability and thereby reversed the Federal District Court for the Central District of California. *Id.* The Supreme Court stated the California Court of Appeal decision was not contrary to or an "unreasonable application" of the Supreme Court's "clearly established" law. *Id.* at ——, 155 L. Ed. 2d at 159.

The defendant in *Andrade* was convicted of two counts of felony theft for stealing less than $200.00 in videotapes from two K-Mart stores. *Id.* at ——, 155 L. Ed. 2d at 152-53. The criminal offenses in

*Andrade* were considered "wobbler" offenses under California law, in that they could be charged either as misdemeanors or felonies at the discretion of the prosecutor. *Id.* at ——, 155 L. Ed. 2d at 152. In *Andrade*, the two counts of theft were charged as felonies. *Id.* at ——, 155 L. Ed. 2d at 153. While the two predicate offenses that allow a defendant to be sentenced under California's "three strikes" law for a third felony must be serious or violent felonies, any felony could result in the "third strike." *Id.* The jury in *Andrade* found the defendant had been convicted of three counts of first degree residential burglary, which qualified as serious or violent felonies under California law. *Id.* The defendant was therefore subject to an application of the "three strikes" law for each of his subsequent convictions for petty theft. *Id.* The trial court sentenced the defendant in *Andrade* to two consecutive terms of twenty-five years to life in prison. *Id.* The California Court of Appeal affirmed the sentence in *Andrade*, citing the United States Supreme Court's decisions in *Harmelin v. Michigan*, 501 U.S. 957, 115 L. Ed. 2d 836 (1991), *Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637 (1983), *and Rummel v. Estelle*, 445 U.S. 263, 63 L. Ed. 2d 382 (1980). *Andrade*, 538 U.S. at ——, 155 L. Ed. 2d at 153. The California Court of Appeal relied heavily upon the facts of the Supreme Court's decision in *Rummel* to reach its conclusion that the sentence at issue in *Andrade* was not disproportionate and did not constitute cruel and unusual punishment. *Id.* at ——, 155 L. Ed. 2d at 153-54 (citation omitted). The Supreme Court of California denied discretionary review, and the Federal District Court for the Central District of California denied the defendant's petition for a writ of habeas corpus. *Id.* at ——, 155 L. Ed. 2d at 154.

The Ninth Circuit, however, granted the defendant a certificate of appealability and reversed the Federal District Court for the Central District of California, stating that the California Court of Appeal decision was an "unreasonable application of clearly established Supreme Court law" because of the California Court of Appeal's disregard of *Solem*, 463 U.S. 277, 77 L. Ed. 2d 637, and thus constituted "clear error." *Andrade*, 538 U.S. at ——, 155 L. Ed. 2d at 154 (citation omitted).

The United States Supreme Court reversed the Ninth Circuit; however, it did so on a jurisdictional basis, never reaching the question of whether the California Court of Appeal erred in its decision that the sentence imposed did not constitute cruel and unusual punishment. *Id.* at ——, 155 L. Ed. 2d at 154-55. The Supreme Court acknowledged that its decisions in this area of the law "have not been

a model of clarity" and that the Supreme Court has "not established a clear or consistent path for courts to follow." *Id.* at ——, 155 L. Ed. 2d at 155 (citations omitted). While the Supreme Court did state that "one governing legal principle emerges as 'clearly established' under [28 U.S.C.] § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years," the Court acknowledged "a lack of clarity regarding what factors may indicate gross disproportionality." *Id.* at ——, 155 L. Ed. 2d. at 156. The Supreme Court did, however, reaffirm that the "gross disproportionality" principle would only be violated in the "exceedingly rare" and "extreme" case. *Id.* (citations omitted).

The Supreme Court, in deciding that the California Court of Appeal decision affirming the sentence in *Andrade* was not "contrary to, [nor] involved an unreasonable application of" the gross disproportionality principle, noted several factors relevant in both *Rummel,* 445 U.S. 263, 63 L. Ed. 2d 382, and *Solem,* 463 U.S. 277, 77 L. Ed. 2d 637, that were also present in *Andrade,* including length of sentence and availability of parole, severity of the underlying offense, and the impact of recidivism. *Andrade,* 538 U.S. at ——, 155 L. Ed. 2d at 156. The Court also noted that the facts in *Andrade* were not materially indistinguishable from *Solem. Andrade,* 538 U.S. at ——, 155 L. Ed. 2d. at 157. The Supreme Court concluded by again emphasizing that "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Id.* at ——, 155 L. Ed. 2d. at 159.

In *Ewing v. California,* the United States Supreme Court did reach the issue of "whether the Eighth Amendment prohibits the State of California from sentencing a repeat felon to a prison term of 25 years to life under the State's 'Three Strikes and You're Out' law." *Ewing v. California,* 538 U.S. ——, ——, 155 L. Ed. 2d 108, 113 (2003). The defendant in *Ewing* was sentenced under California's "three strikes" law to twenty-five years to life for a conviction of "one count of felony grand theft of personal property in excess of $400." *Id.* at ——, 155 L. Ed. 2d at 116. Ewing had previously been convicted of four serious or violent felonies, thereby meeting the predicate for application of the "three strikes" law. *Id.* The Supreme Court denied Ewing's petition for review of the California Court of Appeal decision that had "rejected Ewing's claim that his sentence was grossly disproportionate under the Eighth Amendment." *Id.* at ——, 155 L. Ed. 2d at 116-17. The California Court of Appeal reasoned that recidivist statutes such as the "three strikes" law "serve the 'legiti-

mate goal' of deterring and incapacitating repeat offenders." *Id.* at ——, 155 L. Ed. 2d at 116-17.

A plurality of three Justices employed the "grossly disproportionate" analysis, finding that the sentence imposed in *Ewing* did not violate that principle. *Id.* at ——, 155 L. Ed. 2d at 122-23 (noting that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' "). Justices Scalia and Thomas affirmed the California Court of Appeal in separate concurrences, with each stating that there is no proportionality requirement in the Eighth Amendment. *Id.* at ——, 155 L. Ed. 2d at 123-24 (Scalia, J. concurring in the judgment) (noting that out of respect for *stare decisis*, he would apply the proportionality test if he could intelligently apply it, which he could not do); *Id.* at ——, 155 L. Ed. 2d at 124 (Thomas, J. concurring in the judgment). The four dissenting Justices agreed with the plurality that the "grossly disproportionate" principle applied; however, the dissenting Justices stated that the sentence in *Ewing* violated that standard. *Id.* at ——, 155 L. Ed. 2d at 125 (Stevens, J. dissenting); *Id.* at ——, 155 L. Ed. 2d at 126-27 (Breyer, J. dissenting). Due to the failure of a majority of Justices to reach a consensus on the basis for the result, *Ewing* does not significantly clarify the "grossly disproportionate" standard other than to reaffirm it will be violated only in the "rare" case. 538 U.S. at ——, 155 L. Ed. 2d at 123; *Id.* at ——, 155 L. Ed. 2d at 127-28 (Breyer, J. dissenting).

In applying the Supreme Court's decisions in *Andrade* and *Ewing*, our Court must continue to apply the "grossly disproportionate" principle, remembering that " '[o]nly in exceedingly unusual noncapital cases will the sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment.' " *State v. Hensley*, 156 N.C. App. 634, 639, 577 S.E.2d 417, 421 (2003) (quoting *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983)).

The facts in this case do not meet the standard of an "exceedingly rare" and "extreme" case, in which the "grossly disproportionate" principle would be violated. *Andrade*, 538 U.S. at ——, 155 L. Ed. 2d. at 156; *Ysaguire*, 309 N.C. at 786, 309 S.E.2d at 441; *Hensley*, 156 N.C. App. at 639, 577 S.E.2d at 421. Defendant was convicted of two counts of obtaining property by false pretenses, being a $42,998.00 Chevrolet Suburban and a $13,582.78 motorcycle, through an elaborate scheme of counterfeit certified checks and false checking accounts. The fact that the State has the discretion to select whether it will prosecute

the charge as a felony or a misdemeanor is not a determinative factor in this analysis. *See Andrade,* 538 U.S. at ——, 155 L. Ed. 2d at 152 (where the crime could have been charged as a felony or a misdemeanor); *Ewing,* 538 U.S. at ——, 155 L. Ed. 2d at 122 (affirming the sentence under California's "three strikes" law for a charge that could have been charged either as a felony or a misdemeanor).

Defendant's prior convictions that served as a predicate for defendant to be charged as an habitual felon were: (1) a prior conviction for obtaining property by false pretenses, the same charge defendant has been convicted of in the present case; (2) felony escape from prison; and (3) assault with a deadly weapon on a law enforcement officer. These crimes are serious in nature and at least one is a violent offense. The fact that defendant has now been convicted of two charges of the same offense as one of his predicate offenses for habitual felon status emphasizes the purpose of the Habitual Felon Act:

> "[T]o deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation *and its duration* are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes."

*State v. Aldridge,* 76 N.C. App. 638, 640, 334 S.E.2d 107, 108 (1985) (quoting *Rummel,* 445 U.S. at 284, 63 L. Ed. 2d at 397).

The sentence in the presumptive range for defendant's convictions of two counts of obtaining property by false pretense in violation of N.C. Gen. Stat. § 14-100, a Class H felony, without consideration of the Habitual Felon Act, is a minimum of 16-20 months to a maximum of 20-24 months in each count, given a prior record level of VI. *See* N.C. Gen. Stat. § 15A-1340.17 (2001). Under the North Carolina Habitual Felon Act, defendant's sentence would be as a Class C felon, and the sentence in the presumptive range for defendant's convictions would be a minimum of 135-168 months to a maximum of 171-211 months, given a prior record level of VI. *See* N.C.G.S. § 15A-1340.17. Defendant argues that he should not be subject to North Carolina's habitual felon statute when the underlying felony is a Class H felony. However, as the State points out, this Court has on several occasions affirmed the sentence of a defendant as an

habitual felon where the defendant was convicted of an underlying Class H or Class I felony. *See, e.g., State v. Parks*, 146 N.C. App. 568, 553 S.E.2d 695 (2001), *appeal dismissed and disc. review denied*, 355 N.C. 220, 560 S.E.2d 355, *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 49 (2002) (where the underlying felonies were felonious larceny and felonious possession of stolen goods, Class H felonies under N.C. Gen. Stat. § 14-72); *State v. Hairston*, 137 N.C. App. 352, 528 S.E.2d 29 (2000) (where the underlying felony was felonious breaking and entering a motor vehicle, a Class I felony under N.C. Gen. Stat. § 14-56). As noted above, the underlying felonies of larceny by false pretense in the present case were Class H felonies. Further, as noted by the United States Supreme Court, when deciding whether a sentence is grossly disproportionate, "we must place on the scales not only [a defendant's] current felonies, but also his . . . history of felony recidivism." *Ewing*, 538 U.S. at ——, 155 L. Ed. 2d at 122.

We hold that the sentence imposed on defendant as an habitual felon is not so "grossly disproportionate" as to constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

No error.

Judges HUDSON and STEELMAN concur.