Filed 2/26/14  P. v. Chavez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL LOPEZ CHAVEZ<br><br>Defendant and Appellant. | B242120<br><br>(Los Angeles County<br>Super. Ct. No. KA094909) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, George Genesta, Judge.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

INTRODUCTION

Defendant and appellant Daniel Lopez Chavez (defendant) was convicted of first degree burglary (Pen. Code, § 459[1]) (count 1), felony child molesting (§ 647.6, subd. (b)) (count 2), and failure to register as a sex offender after an address change (§ 290, subd. (b)) (count 3).  On appeal, defendant contends that his sentence of 60 years to life in state prison is unconstitutional as cruel or unusual punishment.  We affirm the judgment.

## BACKGROUND

### A.     Factual Background

#### 1.     Prosecution Evidence

##### a)     Counts 1 and 2

Defendant was a friend of D.J.'s[2] father, A.J.  Until approximately April 2011, defendant lived in the house immediately behind D.J.'s house.  Defendant would occasionally bring A.J.'s family groceries, and defendant and A.J. drank beer together occasionally.

D.J. had contact with defendant when he lived immediately behind her house on one or two occasions.  On one occasion, when D.J. was 16 or 17 years old, her parents were thinking of separating, and when D.J. was home alone, defendant stood at the doorway to D.J.'s house and told D.J. that he would be there for her, and he would "come over later and take care of her."  Defendant's comment made D.J. feel uncomfortable and scared.  D.J. told A.J. that she thought defendant was "creepy" and that she did not "feel right" around him.  As a result, A.J. told defendant that "if you don't see my car, if I'm not around, do not come to my home, because I have children and . . . it's not right."

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

[2]     At the time of trial (in 2012), D.J. was 17 years old.

On Saturday, July 16, 2011, at about 9:00 p.m., D.J. was at home with her younger brothers and her friend C.P.;[3] D.J.'s parents were not present. At about 2:00 a.m. the following morning, D.J. noticed a beige or gold-colored van "pull up" nearby and park across the street, but she "really didn't think anything of it." At about 2:30 a.m., D.J. and C.J. started playing basketball in the front yard. The girls then went back inside D.J.'s house, and when they re-entered the house they left the door open behind them.

At about 3:00 a.m.—approximately one hour after D.J. first saw the van—and as C.P. was about to close the door, defendant knocked on the open door. D.J. did not immediately see him because she was down a hallway, but she called out to find out who was there, and defendant responded by identifying himself. D.J. "was a little nervous . . . [and] continued to ask what he wanted. Because I didn't know why he was there."

D.J. went to the door and spoke to defendant for about 10 to 15 minutes. D.J. said defendant "seemed little drunk" because of the way he was standing—leaning against the wall—but neither D.J. nor C.P. smelled alcohol coming from him, or noticed that he slurred his words.

Defendant asked D.J. whether her parents were home. D.J. said her father was home asleep, and defendant asked D.J. to wake up her father. D.J. said no because he was asleep and had to rest for work in the morning. In fact, A.J. was not actually home, but D.J. lied because she was "scared" and did not want defendant to know that she, C.P., and D.J's younger brothers were alone. Defendant asked if D.J.'s mother was home, and D.J. said that she was not. Defendant then asked for D.J.'s parents' phone number.

At that point, D.J.'s youngest brother woke up and C.P. took him back to his room. When C.P. returned, D.J. was still talking to defendant, but D.J. sounded worried and was telling him to leave. D.J. told defendant her father's telephone number. Defendant asked D.J. to get a pencil to write down A.J.'s phone number, but D.J. did not

---

[3] The reporter's transcript does not disclose her last name, but her last name, starting with the initial "P," is disclosed in the People's trial brief and defendant's motion for new trial. At the time of trial, C.P. was 16 years old.

want to step away from the door because she was worried defendant would take the opportunity to enter the house. D.J. offered to input the number into defendant's phone. As she did so, defendant stepped approximately one foot inside the house.

Defendant asked D.J. how her parents were doing and how she was doing. Defendant put his arm around D.J.'s shoulder and neck area, put his hand on her arm, tried to hug her, and touched her face. Defendant tried to pull D.J.'s face closer to his face, but D.J. "wiggled out" of his grasp and eventually pushed him away. D.J. and C.P. repeatedly told defendant that he had to leave. D.J. believed that defendant was trying to kiss her, which scared her because she had not invited him inside and he did not have permission to touch her. Defendant said, "I'm not going to hurt you." C.P. told defendant that he was making too much noise and it would wake up A.J.

Eventually, defendant stepped outside the house and the girls closed and locked the door. As defendant walked out of the house, with his back to the house, he said over his shoulder, in a low, quiet voice, that D.J. and C.P. should lock all the doors and windows and turn off the lights. That statement made D.J. and C.P. feel uneasy and scared. After defendant exited the house and D.J. and C.P. locked the door, defendant stood near the doorway for several minutes, facing away from the house.

Shortly thereafter, C.P. heard the unlocked gate between the front yard and the side yard open. C.P. and D.J. ran to the den, which had windows opening to the side yard, and saw defendant standing approximately three feet past the gate into the side-yard, facing the house. Defendant watched the two girls. C.P. and D.J. yelled at defendant—through a broken plastic window that one "can hear anything through"—to leave, but defendant "just stood there," expressionless.

C.P. and D.J. threatened to call the police, but defendant did not move. C.P. dialed 911 and handed the telephone to D.J., who told the dispatcher that someone was trying to break into the house and that the intruder could hear what she was saying. Approximately 30 or 45 seconds later, when C.P. started to tell the dispatcher the address, defendant walked briskly or ran back to the van that D.J. previously saw, entered it, and left the area. The van drove away quickly but it did not swerve or appear out of control.

4

The entire incident, from the knock on the door to the time defendant drove away, lasted approximately 15 to 20 minutes.

D.J. called A.J. after she completed her telephone call to the 911 dispatcher. After defendant drove away, C.P. and D.J. woke up both of D.J.'s brothers and put them in one room, where all four of them waited for the police. They were scared that defendant might return. Police officers eventually arrived and searched the house.

Defendant's mother, R.C., lived with defendant. After 2:00 a.m. on July 17, 2011, defendant left their home while she was asleep, and after R.C. awoke defendant returned home in her van with a friend. R.C. said defendant and the friend smelled of alcohol, and they appeared to be intoxicated.

Los Angeles County Sheriff's Deputy Lisa Sanders was one of the peace officers who responded to D.J.'s 911 call. Deputy Sanders observed that D.J. was shaken and in distress. D.J. told Deputy Sanders what had occurred. D.J.'s father, A.J., arrived at the house, and he told Deputy Sanders that defendant knew that he was not allowed at the house if there were no vehicles in the driveway.

Los Angeles County Sheriff's Deputy Patrick Bohnert and Deputy Sanders went to defendant's home at 4:30 a.m. to apprehend him on suspicion of burglary and sexual assault. They contacted defendant who did not appear to be intoxicated. Defendant told Deputy Bohnert that he was sleeping "the whole time," and did not tell Deputy Bohnert that he just arrived home. R.C. told Deputy Bohnert that defendant must have been the person who drove the van. R.C. later told defendant's investigator, however, that she told the police that her daughter was the last person to drive the van before defendant was arrested, and she did not tell the truth to the officers—that defendant drove the van—because she believed defendant had been drinking and she did not want him "to get in trouble."

Deputies Bohnert and Sanders detained defendant at his home. D.J. identified defendant, and he was arrested.

5

b)	Count 3

On November 13, 1989, defendant pled guilty to a residential burglary with the intent to commit sexual battery, and was required to register thereafter as a sex offender. On January 12, 2011, defendant filed a change of address sex offender registration form with West Covina Police Department Sergeant Travis Tibbetts who oversaw the registration of sex offenders (agency) stating that defendant would no longer register at the agency in West Covina and instead would be registering at the agency in Baldwin Park.

Baldwin Park Police Department Detective Diana Larriva was assigned to the registration of sex offenders for registrants with the last name beginning with the letters A through H. Detective Larriva was personally familiar with each of her 25 registrants and personally was responsible for obtaining contact information from them after they announced their intention to register in the city, but she never registered defendant and did not recognize him. If an individual wishing to register came in person to the police station without an appointment, he or she is given a pink form with the telephone number and instructions on how to make an appointment. Diana Larriva checks her voicemail messages for the telephone number provided on the pink form about twice a day, and she never received a telephone message from defendant indicating he wanted to register as a sex offender there. If defendant had called her office wishing to register, she would have called him back to advise him of the proper procedure to register. Detective Larriva did not check with all of her record clerks about whether defendant had applied to register as a sex offender and whether the application had been lost; her records clerks do not take applications for the registration of sex offenders.

2.	*Defendant's Evidence*

a)	Counts 1 and 2

During the evening of July 16, 2011, Eduardo Rodriguez and defendant had been consuming alcohol. At one point, defendant asked Rodriguez to "come along for a ride

6

with me" to "see a friend." Rodriguez said defendant was "pretty intoxicated," but defendant drove he and Rodriguez in defendant's van. They drove to a residential neighborhood, parked the van, and defendant got out the van telling Rodriguez that he would be back. Rodriguez did not know what defendant wanted to do there. A few minutes later, defendant returned to the van at a normal pace, and they drove back to their homes.

Defendant's brother testified that he did not believe that defendant had a special or unusual interest in minor girls. The boyfriend of defendant's sister testified that he had known defendant for approximately five years, and defendant had never displayed an unusual interest in minor girls.

### b) Count 3

R.C., defendant's mother, went with defendant three times to the Baldwin Park Police Department to register as a sex offender with a form called a "pink slip." She stayed in the car while defendant went into the police station. R.C. also heard defendant call the police department on the phone attempting to make an appointment to register.

R.C. believed that defendant's attempts to register in person failed because he was turned away and told to make an appointment by phone. R.C. believed that defendant tried to make a phone appointment by calling the police department at least once per day from March to July, 2011, but nobody ever answered or returned his calls.

### B. Procedural Background

The District Attorney of Los Angeles County filed an information charging defendant with first degree burglary in violation of section 459—a violent felony within the meaning of section 667.5, subdivision (c) because a person other than an accomplice was present in the residence during the commission of the offense (count 1); felony child molesting in violation of section 647.6, subdivision (b) (count 2); and failure to register as a sex offender after an address change in violation of section 290, subdivision (b) (count 3). The district attorney alleged as to count 1 that defendant had suffered two

7

prior convictions pursuant to section 667, subdivision (a)(1); and as to all counts, defendant had been convicted of seven prior offenses pursuant to the "Three Strikes" law in violation of sections 667, subdivisions (b)-(i), and 1170.12, subdivisions (a)-(d). Specifically, defendant was convicted in May 1986, for violation of section 245, subdivision (a)(1); and in November 1989, defendant suffered six convictions: two convictions for violation of section 261, subdivision (2), two convictions for violation of section 288a, subdivision (c), one conviction for violation of sections 664 and 286, subdivision (c), and one conviction for violation of section 459 in the first degree.

Following a trial, the jury found defendant guilty on all counts. Defendant admitted his prior convictions, and the trial court therefore found true the allegations pursuant to section 667, subdivisions (a)(1) and the Three Strikes law.

The trial court sentenced defendant to state prison for a term of 60 years to life, consisting of a term of 25 years to life pursuant to the Three Strikes law, plus five additional years for each of his two prior convictions pursuant to section 667, subdivision (a)(1), on count 1; 25 years to life pursuant to the Three Strikes law, and the sentence was stayed pursuant to section 654, on count 2; 25 years to life pursuant to the Three Strikes law, to be served consecutively to count 1, on count 3. The trial court ordered defendant to pay various fines, fees and assessments, and awarded defendant 381 days of custody credit consisting of 333 days of actual custody credit and 48 days of conduct credit.

## DISCUSSION

Defendant contends that his sentence of 60 years to life in state prison, consisting of 35 years to life on count 1, and 25 years to life on count 3, is unconstitutional as cruel or unusual punishment under the federal and California Constitutions. We disagree.

### 1.     *Applicable Law*

The United States Constitution prohibits the imposition of cruel and unusual punishment (U.S. Const., 8th Amend.), and the California Constitution prohibits the imposition of cruel or unusual punishment (Cal. Const., art I, § 17). The California and

8

federal constitutional provisions have both been interpreted to prohibit a sentence that is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted, superseded on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51, 52; see also *Ewing v. California* (2003) 538 U.S. 11, 32-35; *Harmelin v. Michigan* (1991) 501 U.S. 957, 962.) The federal constitutional standard is one of gross disproportionality. (*Ewing v. California*, *supra*, 538 U.S. at p. 21; *Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1001.) Successful challenges to the proportionality of particular sentences have been very rare. (*Rummel v. Estelle* (1980) 445 U.S. 263, 272; *Ewing v. California*, *supra*, 538 U.S. at p. 21 ["'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare'"]; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["Findings of disproportionality have occurred with exquisite rarity in the case law"].)

The California Supreme Court has instructed that when reviewing a claim of cruel or unusual punishment, courts should examine the nature of the offense and offender, compare the punishment with the penalty for more serious crimes in the same jurisdiction, and measure the punishment to the penalty for the same offense in different jurisdictions. (*People v. Dennis* (1998) 17 Cal.4th 468, 511; *In re Lynch*, *supra*, 8 Cal.3d at pp. 425-427.) Defendant does not contend that his punishment is unconstitutional in the abstract, but as applied to him. Thus, defendant's argument addresses the first factor identified in *In re Lynch*—the nature of the offense and the offender. Regarding the nature of the offense and the offender, we evaluate the totality of the circumstances surrounding the commission of the current offenses, including the defendant's motive, the manner of commission of the crimes, the extent of the defendant's involvement, the consequences of his acts, and his individual culpability, including factors such as the defendant's age, prior criminality, personal characteristics, and state of mind. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

Regarding the Three Strikes law, "California appellate courts have consistently found [that it] is not cruel and unusual punishment." (*People v. Mantanez* (2002) 98

9

Cal.App.4th 354, 359, citing *People v. Cooper* (1996) 43 Cal.App.4th 815, 826-827.) The United States Supreme Court has also held that California's Three Strikes law is a constitutional punishment for a repeat felony offender, even when his offenses are only theft-related, because he has proved "'simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.'" (*Ewing v. California*, *supra*, 538 U.S. at p. 21, citing *Rummel v. Estelle, supra,* 445 U.S. at p. 284.)

### 2.    *Procedural History*

At the sentencing proceedings, the trial court stated, "The court has read and reviewed the probation's officer's report . . . and the static 99 report in this matter. [¶] The static 99 indicates that . . . [defendant has] a score of 5 with moderate to high range of risk. Court also notes the defendant's prior convictions not only for crimes of violence, but also for sexually violent crimes in the past. Although they are old in terms of 1989, the defendant has not lead a blameless life since then. [¶] Since then, he has incurred additional criminal convictions in 2006 for being under the influence of a controlled substance, in 2008 for exhibiting a deadly weapon, not a firearm. Although both are misdemeanors and he was placed on probation, it indicates that the defendant is still engaging in criminal activity either in substance abuse, which was a circumstance in this case, and also the use of weapons, which are a matter of great concern to the court, given the defendant' prior criminal history of engaging in a prior first degree burglary and a prior 245 assault and also engaging in a prior rape and violent sexual crimes. [T]he court has taken that into consideration in terms of sentencing."

The trial court indicated it would sentence defendant on count 3, failure to register as a sex offender, concurrently with the sentence for burglary in count 1. On advice from the prosecutor, and after consulting the Penal Code, however, the trial court concluded that it was required to run the sentences consecutively.[4] The trial court stated that it will

---

[4]      Section 667, subdivision (c), provided that, "Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more serious and/or violent prior felony convictions . . . the court

10

not entertain mitigation statements by the defense because the trial court "has no discretion in . . . the sentencing . . .[;] once the serious or violent felony has been proved [to] a jury and [defendant] found guilty beyond a reasonable doubt—felony convictions—and then the strike offenses have been proved, the court has no further discretion."

Defendant's counsel acknowledged the trial court's lack of discretion but nevertheless stated that defendant's offenses in this case were "minimal and minor." The trial court then stated, "Only [defendant] can answer the unasked questions. You know, that substance abuse was allegedly a problem with him in the past, that he was allegedly attempting to conquer it, according to his defense witnesses. But, nonetheless, his substance abuse has not been limited to alcohol. The most recent conviction a couple years ago had to do with a controlled substance, and what a play alcohol had in this particular case did not rise to the level that he was—to an alcohol defense (*sic*). [¶] [Defendant] was out at 2:00 or 3:00 o'clock in the morning, parked out in front of a residence. Two young girls playing basketball and his car's parked there. . . . [There was] no evidence that he immediately got out of the van and approached the residence and knocked on the door and tried to make contact with the father, but the vehicle had been parked there for at least an hour. And, circumstantially, he was outside while the girls were playing basketball, and he does not exit the van until the girls enter the residence and the front door is open. [¶] His conduct is unexplained, why he—at that point he satisfactorily to the jury and to the court that he is making contact with the girls at this time of the morning where he didn't have any observation of the father being present, who was allegedly the person who he was wishing to make contact with. And his presence at the side of the house after he was told to leave, going through a locked gate at the side of the house, that is an unanswered question that only he can answer of

shall adhere to . . . the following: [¶] . . . [¶] (6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count . . . ." (See also section 1170.12, subd. (a)(6).)

what his intentions were, if he had not been discovered by the young girls outside that window. [¶] However, that conduct in and of itself with this defendant's criminal history and specific criminal history rises to the level that he definitely presents a danger to the community."

As noted above, the trial court sentenced defendant to state prison on count 1 for a term of 25 years to life pursuant to the Three Strikes law, plus five additional years for each of his two prior convictions pursuant to section 667, subdivision (a)(1); on count 2 for a stayed sentence of a term of 25 years to life pursuant to the Three Strikes law; and on count 3 for 25 years to life pursuant to the Three Strikes law, to be served consecutively to count 1. That is, the trial court sentenced defendant to state prison for a total term of 60 years to life.

### 3.    *Analysis*

#### a)    Defendant's Sentence on Count 1

Defendant contends that his sentence of 35 years to life in state prison on count 1 is unconstitutional as cruel or unusual punishment under the federal and California Constitutions. We disagree.

Defendant's sentence for count 1 was not grossly disproportional to the nature of his crime. Prior to the incident, when defendant lived in a house immediately behind D.J.'s house, A.J. told defendant not to go to the house if defendant does not see A.J.'s car because, "I have children and . . . it's not right." On the date of the incident, in the early morning hours, defendant parked his van in the street across from D.J's home for about one hour—long enough to know that A.J.'s car was not visible and that A.J. may not be at the home. During that time, D.J. and C.P. were playing basketball in the front yard.

At 3:00 a.m., after D.J. and C.P. went back inside the house, defendant knocked on the door to the home and asked D.J. whether her parents were home. When D.J. told defendant that A.J. was asleep, defendant asked that she wake him. When D.J. instead

12

offered to input A.J.'s telephone number into defendant's telephone phone, defendant stepped inside the house without D.J.'s permission. Then, without D.J.'s permission, defendant put his arm around D.J.'s shoulder and neck area, put his hand on her arm, tried to hug her, touched her face, tried to pull D.J.'s face closer to his face, and attempted to kiss D.J. D.J. pushed defendant away, and D.J. and C.P. repeatedly told defendant to leave. It is reasonable to conclude that D.J. and C.P. made it clear to defendant that they were intimidated by him, and that they did not want him to be in or near the home. Defendant, however, did not immediately leave. When defendant did leave, with his back to the house, he stated over his shoulder, in a low, quiet voice, that D.J. and C.P. should lock all the doors and windows and turn off the lights—causing D.J. and C.P. to feel uneasy and scared. It is reasonable to conclude that defendant intended to disturb D.J. and C.P. when he made his statement to them to lock the doors.

Defendant then opened the gate between the front yard and the side yard of the house, went into the side yard, and stood watching D.J. and C.P. C.P. and D.J. yelled at defendant to leave, but defendant "just stood there," expressionless. When C.P. and D.J. threatened to call the police, defendant still did not move. Defendant fled only when he realized that the police were on their way to the home.

Defendant has previously been convicted of sex offenses, burglary and controlled substance abuse. Defendant had seven prior strike convictions, six of which—occurring on the same occasion—included burglary with the intent to commit sexual battery, attempted sodomy of a child, and rape. Although those strike convictions occurred in the mid- to late 1980's, according to the probation report, defendant was convicted in 1999 for failure to register as a sex offender in violation of section 290, subdivision (g)(2); in 2006 for use and/or being under the influence of a controlled substance in violation of Health and Safety Code section 11550, subdivision (a); and in 2009 for exhibiting a deadly weapon in violation of section 417, subdivision (a)(1). Defendant's criminal activities in the present case are consistent with his prior criminal conduct. Defendant's sentence under count 1 is proportional to his crime because it is based on his recidivism.

13

b)       Defendant's Sentence on Count 3

Defendant contends that his sentence of 25 years to life in state prison pursuant to the Three Strikes law on count 3 for failure to register as a sex offender after an address change in violation of section 290, subdivision (b), is unconstitutional as cruel or unusual punishment under the federal and California Constitutions.

Defendant's sentence for count 3 was not grossly disproportional to the nature of his crime.  Defendant undermined the purpose of the sex offender registration law by failing to notify the authorities of his location in a new city, and defendant was sentenced pursuant to the Three Strikes law.

*In re Coley* (2012) 55 Cal.4th 524, the California Supreme Court held that a third strike sentence may be constitutional following a conviction pursuant to section 290.  In that case, the defendant was required to register as a sex offender, but failed to do so following his release from prison and within five days of his birthday that year.  The police obtained the defendant's address by reviewing paperwork he filed with the Department of Motor Vehicles (DMV) and arrested him.  (*Id*. at pp. 532-533.)  Following a jury trial, the defendant was acquitted of failing to register upon his arrival in the jurisdiction (§ 290, former subd. (a)(1)(A), now §§ 290, subd. (b), 290.013, 290.015), but was found guilty for failing to update his registration within five working days of his birthday (§ 290, former subd. (a)(1)(D), now § 290.012).  (*Id*. at p. 533, 535.)

In *In re Coley*, *supra*, 55 Cal.4th 524, the evidence presented at trial included testimony from the sex offender registry clerk responsible for registering sex offenders where the defendant resided that the defendant did not register as a sex offender after he was released from prison; the absence of any documentation proving that the defendant registered; the defendant's admission to a police officer that he did not want any contact with the peace officer agencies—a statement that the defendant denied making; and the defendant's failure to contact his parole officer upon his release from prison.  (*Id*. at pp. 532-535, 561.)  The defendant testified that he had, in fact, registered as a sex offender upon his release from prison, but admitted that he had not updated his registration within five days of his birthday that year because, according to the defendant, he believed he

14

only had to register once a year, and he therefore did not have to register again until his birthday the following year. (*Id*. at pp. 534.) In holding that the defendant's third strike sentence was constitutional, the court concluded that the defendant had not merely made a negligent or technical oversight in failing to register, but had displayed an intentional unwillingness to comply with the registration requirement. (*Id*. at pp. 561-562.)

In this case, as in *In re Coley*, *supra*, 55 Cal.4th 524, the person in charge of sex offender registration in defendant's jurisdiction testified that defendant never contacted her to attempt to register as sex offender. Defendant's mother, R.C., testified that she believed that defendant tried to make a telephone appointment by calling the police department at least once per day from March to July, 2011, but nobody ever answered or returned his calls, and that she heard defendant call the police department on the phone to try to make an appointment to register. There is no documentation in the record, including telephone records, concerning defendant's telephoning the police department to make an appointment to register as a sex offender. In addition, Detective Larriva testified that she regularly checks her voicemail messages about twice a day and she never received a telephone message from defendant indicating he would like to register as a sex offender there.

R.C. also testified that she went with defendant to the Baldwin Park Police Department on three occasions to register as a sex offender with a form called a "pink slip", and she waited in the car while defendant went into the police station. There is no documentation in the record concerning defendant's appearances at the Baldwin Park Police Department attempting to register as a sex offender at his new address.[5] In addition, Detective Larriva testified that a pink slip is not a method of registering as a sex offender, and instead it is given to individuals wishing to register who come in person to

---

[5]    Citing to the record, defendant states in his opening brief that, "[He] apparently wrote his name, phone number and date of birth on [the pink slip providing instructions on how to make an appointment to register as a sex offender] and left it [at the Baldwin Police Department]." The record, however, does not support defendant's statement.

the police station without an appointment—providing the telephone number and instructions on how to make an appointment.

Defendant was previously registered as a sex offender with the West Covina Police Department. A reasonable inference can be made, therefore, that defendant knew of the proper registration procedures to register as a sex offender. For approximately four months—between March and July of 2011—defendant failed to follow the proper registration procedures to inform the Baldwin Park police of his new address.

Defendant's sentence on count 3 is also appropriate when considered in conjunction with his long criminal history. In *People v. Meeks* (2004) 123 Cal.App.4th 695, the defendant also failed to register within five days of changing his address. (*Id*. at p. 706.) Similar to defendant's prior crimes here, in that case the defendant's prior crimes included burglary, rape, robbery, assault with a deadly weapon, and drug possession, which he committed over a substantial period of time and between about 7 to 31 years prior to his conviction for failure to register. (*Id*. at p. 708.)

The court in *People v. Meeks, supra,* 123 Cal.App.4th 695 rejected the defendant's characterization of his failure to register as "'de minimis as felonies go,'" stating that "sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses," and that registration of individuals convicted of such crimes protects public safety. (*Id*. at pp. 709-710.) The court also stated that, "[t]aking into account, as we should, not only the seriousness of defendant's current offense, but also his history of repeated violations of the criminal law that spanned at least 30 years, we cannot say that his sentence is grossly disproportionate to his current offense when viewed in light of his long-standing, and sometimes violent, criminal history." (*Id*. at p. 709.)

Here, as in *People v. Meeks*, *supra*, 123 Cal.App.4th 695, defendant changed his address without registering as a sex offender, and he had committed numerous serious prior property and sex crimes for a substantial period of time before his failure to register. Defendant's sentence for count 3 was not cruel or unusual punishment.

Defendant relies on *People v. Carmony* (2005) 127 Cal.App.4th 1066, which held that the defendant's sentence of 25 years to life in prison for failure to register as a sex offender within five days of his birthday was unconstitutional. (*Id.* at pp. 1071-1072.) That case, however, is distinguishable. As the court stated, "The purpose of the sex offender registration law is to require that the offender identify his present address to law enforcement authorities so that he or she is readily available for police surveillance. In this case the defendant did so one month prior to his birthday and was in fact present at his registered address when the arrest for the present violation was made. The stated purpose of the birthday registration requirement was (and still is) to 'update' the existing registration information. [Citation.] [¶] Here, there was no new information to update and the state was aware of that fact. Accordingly, the requirement that defendant reregister within five days of his birthday served no stated or rational purpose of the registration law and posed no danger or harm to anyone. [¶] Because a 25-year recidivist sentence imposed solely for failure to provide duplicate registration information is grossly disproportionate to the offense, shocks the conscience of the court and offends notions of human dignity, it constitutes cruel and unusual punishment under both the state and federal Constitutions." (*Id.* at pp. 1072-1073.) The court limited the scope of its holding, stating, "We have no occasion to consider the appropriateness of a recidivist penalty where the predicate offense does not involve a duplicate registration." (*Id.* at p. 1073, fn. 3.)

Here, unlike in *People v. Carmony*, *supra,* 127 Cal.App.4th 1066, defendant did not fail to provide duplicate registration information. He failed to provide registration information for his new address after an address change. The fact that officers were able to locate quickly defendant's Baldwin Park address after the burglary does not excuse him from the registration requirement or require that we hold defendant's sentence is unconstitutional. In *In re Coley, supra,* 55 Cal.4th 524, for example, the police used DMV records to locate the defendant (*id.* at pp. 532-533), yet the court found that the defendant's third strike sentence was constitutional. (*Id.* at pp. 561-562.)

17

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


MINK, J. *

---

*      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.